6 P.3d 38 (2000)
101 Wash.App. 533
STATE of Washington, Respondent,
v.
Ronald Dean KENNARD, Appellant.
No. 42721-1-I.
Court of Appeals of Washington, Division 1.
July 10, 2000.
Publication Ordered July 24, 2000.
Suzanne L. Elliott, Seattle, for Appellant.
Ronald D. Kennard, pro se.
Norm Maleng, Prosecuting Attorney, and Lee D. Yates, Deputy, for Respondent.
*39 WEBSTER, J.
Appellant Ronald Dean Kennard was convicted of two counts of second degree robbery and one count of first degree robbery. In this appeal, he (1) challenges a jury instruction defining the phrase "to display what appears to be a firearm", (2) argues that the evidence presented at trial is insufficient to support his convictions, and (3) asserts that the trial court abused its discretion by admitting testimony regarding his petitions for bankruptcy. Finding no error, we affirm.

BACKGROUND
The evidence at trial included testimony by three bank tellers who were robbed: (1) Shauna Cagle, an employee at Key Bank, who was robbed on April 15, 1997; (2) Andrina Herring, an employee at Washington Mutual Bank, who was robbed on May 12, 1997; and (3) Roberta Wall, an employee at SeaFirst Bank, who was robbed on July 3, 1997, at about 4:00 p.m. Each teller made a positive in-court identification of Kennard as the robber. The State also introduced still photographs of the robber taken during each of the three bank robberies. Only the May robbery was presented to the jury as first degree robbery; the April and July robberies went to the jury as second degree robberies.
Regarding the July robbery, Christopher McClincy testified that he saw a man leave SeaFirst bank with pinkish-red smoke coming out of his jacket. The man got into a red Toyota Corolla. Jeremy Selbach, thirteen-years old at the time of the robbery, testified that he saw a man run out of the bank with pink smoke coming from under his coat. Selbach watched the man get into a red Corolla and memorized the license plate number. Selbach's mother, Eufemia Davis, also testified that she witnessed a man run out of the bank with red smoke coming from *40 him. She also memorized the license plate of the car. Investigating detectives determined that the car was registered to Estelle Hagey, Kennard's mother.
Kennard and witnesses for the defense testified to provide Kennard with alibis for the robberies. Kennard's mother testified that Kennard came to visit her in Selah, Washington, on Mother's Day, Sunday, May 11, 1997, and that he stayed in Selah until Friday. She testified that she saw him every day of his visit. Hagey testified that Kennard had access to her checking and savings accounts, with funds totaling $79,000 to $82,000. Hagey testified that she gave Kennard six or seven thousand dollars in late May or early June 1997. Josephine Castro, a resident of Selah, testified that she saw Kennard at Hagey's house on May 21, 1997.
Kennard's wife, Laura Kennard, testified that Kennard was in Oregon on April 14-16, 1997. Kennard's nephew, Christopher Brown, testified that he accompanied Kennard on the April trip to Oregon. Kennard's wife confirmed that Kennard was at his mother's on May 12. She also said that on July 3, 1997, she drove the red Corolla to work, that it was parked in the parking lot all day, and that she drove it home between 3:30 p.m. and 4:20 p.m.
The trial court allowed the testimony of a staff attorney for the Seattle Chapter 13 trustee who testified regarding the Kennards' bankruptcy petitions.

ANALYSIS

I. The Challenged Jury Instruction
"Instructions satisfy the requirement of a fair trial when, taken as a whole, they properly inform the jury of the applicable law, are not misleading, and permit the defendant to argue his theory of the case." State v. Tili, 139 Wash.2d 107, 126, 985 P.2d 365 (1999). The wording of jury instructions is left to the discretion of the trial court. See Douglas v. Freeman, 117 Wash.2d 242, 256, 814 P.2d 1160 (1991). But claimed errors of law in jury instructions are reviewed de novo, and an instruction containing an erroneous statement of the applicable law is reversible error where it causes prejudice. See Hue v. Farmboy Spray Co., Inc., 127 Wash.2d 67, 92, 896 P.2d 682 (1995); State v. Walker, 136 Wash.2d 767, 772, 966 P.2d 883 (1998).
The court instructed the jury here that an element of robbery in the first degree is that the defendant "displayed what appeared to be a firearm or other deadly weapon" in the commission of the crime. CP at 53. Kennard argues that the court's instruction explaining the phrase "to display what appears to be a firearm" was an incorrect statement of law. The challenged instruction stated:
"To display what appears to be a firearm" means to exhibit or show what appears to be a firearm to the view of the victim or to otherwise manifest by words and actions the apparent presence of a firearm even though it is not actually seen by the victim.
CP at 55. The point of contention is that the instruction allows the jury to find that the display element of the crime is met even where a victim does not actually see the firearm.
We find that this instruction correctly states the law. In State v. Henderson, 34 Wash.App. 865, 868-69, 664 P.2d 1291 (1983), the evidence showed that the victim of a robbery observed that the defendant's right hand was concealed in his right front pocket, which had a bulge, and the victim believed that the defendant had a small caliber pistol. See id. at 866, 664 P.2d 1291. When the victim of a second robbery, in response to the defendant's demand for all her money, asked, "Are you kidding?", the defendant replied, "No. I have this," and put his hand in his jacket pocket. See id. at 867, 664 P.2d 1291. This victim also believed that the defendant was armed. See id. The defendant argued that there was insufficient evidence to prove the element "displays what appears to be a firearm or other deadly weapon" because neither of the victims actually saw a weapon. See id. The Henderson court concluded that the evidence in both instances satisfied the element in question:
It seems to us that where the accused indicates (verbally or otherwise) the presence of a weapon (real or toy), the effect *41 on the victim is the same whether it is actually seen by the victim or whether it is directed at the victim from inside a pocket. In either situation the apprehension and fear is created which leads the victim to believe the robber is truly armed with a deadly weapon. Accordingly, the victim feels compelled to comply with the accused's demand for money.
Id. at 868-69, 664 P.2d 1291.
Kennard next argues that this instruction explaining "to display what appears to be a firearm" was an unconstitutional comment on the evidence. A trial court is prohibited from commenting on the evidence presented at trial. See WASH. CONST. art. IV, § 16; Tili, 139 Wash.2d at 126, 985 P.2d 365. "An impermissible comment is one which conveys to the jury a judge's personal attitudes toward the merits of the case or allows the jury to infer from what the judge said or did not say that the judge personally believed the testimony in question." Tili, 139 Wash.2d at 126, 985 P.2d 365 (internal quotations and citations omitted).
Kennard argues that the challenged instruction was a comment on the evidence because it reflected an opinion that Kennard could be convicted of first-degree robbery even if the victim did not see the gun, which Kennard claims is not true under the robbery statute. Thus, Kennard's argument that the instruction is an unconstitutional comment on the evidence is based on his argument that the instruction is incorrect as a matter of law. Because we find that the challenged instruction correctly reflects the law, Kennard's argument that it is an improper comment on the evidence fails. Furthermore, the wording of the instruction is neutral and does not indicate the judge's belief concerning the evidence.

II. Sufficiency of the Evidence
We will find that evidence is sufficient to support a conviction if, after viewing the evidence in a light most favorable to the State, we determine that "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Randhawa, 133 Wash.2d 67, 73, 941 P.2d 661 (1997) (internal quotations and citations omitted). A claim that the evidence is insufficient admits the truth of the State's evidence and all reasonable inferences therefrom. See State v. Salinas, 119 Wash.2d 192, 201, 829 P.2d 1068 (1992). All reasonable inferences are drawn in favor of the State and strongly against the defendant. See State v. Jackson, 137 Wash.2d 712, 730, 976 P.2d 1229 (1999).
A. Evidence that the Gun Was Displayed
Kennard argues that insufficient evidence was presented at trial to convict him of first degree robbery in count two because the evidence does not prove that he displayed what appeared to be a deadly weapon to Herring, the Washington Mutual bank teller.
As discussed above, a conviction for first degree robbery will be sustained where the evidence is sufficient to show that the accused indicated, verbally or otherwise, the presence of a weapon because the effect on the victim is the same regardless of whether the victim actually sees the weapon. See Henderson, 34 Wash.App. at 869, 664 P.2d 1291. The State is not required to prove that the defendant brandished the weapon or that the victim saw the weapon. See id.
We find that the evidence here was sufficient for a rational trier of fact to find beyond a reasonable doubt that Kennard displayed what appeared to be a weapon as that element is defined. Herring testified that although she did not see a gun, the defendant indicated that he was armed:
A. He told me to give him the money. I looked at him and go what money [sic] and he said the money in your drawer [sic]. He said I have a gun [sic] and he patted his hip and said that he knew where I lived after he told me he had a gun.
Q. How did you feel when the robber told you he had a gun?
A. Threatened.
Q. All right.
A. Scared. I never saw the gun, but it still terrified me that he said he had one.
RP (January 14, 1998) at 72.
B. Evidence that Kennard Committed the Three Robberies
Pointing to a lack of forensic evidence linking Kennard to the robberies, the *42 claimed lack of motive, and the alibi testimony, Kennard argues that the evidence was insufficient to convict him of the three robberies. But the jury is free to judge the credibility of the alibi testimony, and Kennard ignores the evidence that the State did present: (1) all three bank tellers who were robbed made positive in-court identifications of Kennard; (2) still photographs of the robber taken by security cameras in all three banks were introduced and shown to the jury; and (3) testimony identified the get-a-way car that the robber used at the SeaFirst robbery, and this car was linked to Kennard. We find that this evidence is sufficient to support the jury's conclusions.

III. The Evidentiary Rulings
Kennard argues that the trial court erred in admitting evidence concerning his bankruptcy proceedings because such evidence is not relevant. We will not reverse a trial court's evidentiary rulings absent an abuse of discretion. See State v. Powell, 126 Wash.2d 244, 258, 893 P.2d 615 (1995).
We find that the trial court did not abuse its discretion here. Evidence concerning a defendant's bankruptcy and poor financial condition is admissible to show that the defendant was living beyond his means. See State v. Matthews, 75 Wash.App. 278, 286-87, 877 P.2d 252 (1994). In Matthews, the defendant was convicted of first degree murder. See id. at 279, 877 P.2d 252. The State's theory at trial was that the murder occurred when the defendant, a financially pressured man, attempted a robbery See id. at 284, 877 P.2d 252. The trial court allowed testimony concerning the defendant's financial situation and recent bankruptcy. See id. at 282-83, 877 P.2d 252. While the court agreed with the defendant's argument that a bankruptcy actually relieves financial stress rather than adds to it, the court accepted the bankruptcy evidence as a foundation for evidence that the defendant was living beyond his means, which could reasonably provide a motive for robbery, and in turn, for the murder. See id. at 284, 877 P.2d 252. Although the Matthews court recognized that evidence of a poor financial condition may be highly prejudicial standing alone because the inference that poverty leads to crime is impermissible, the court found that the evidence presented was permissible where the focus was on the fact that the defendant's lifestyle exceeded his income. See id. at 286-87, 877 P.2d 252. The evidence established more than the mere fact that the defendant was poor. See id. at 287, 877 P.2d 252.
Kennard steers us away from Matthews, pointing instead to several federal cases finding that a bankruptcy petition is not in and of itself evidence of immediate financial need for the purposes of proving motive. See United States v. Reed, 700 F.2d 638, 642-43 (11th Cir.1983); United States v. Bensimon, 172 F.3d 1121, 1129 (9th Cir. 1999). Evidence of poverty is generally not admissible to show motive. See United States v. Mitchell, 172 F.3d 1104, 1108 (9th Cir.1999) (finding that the trial court erred in admitting evidence concerning the defendant's financial status because the evidence did not show more than the mere fact that the defendant was poor). But evidence regarding a defendant's financial state is admissible if accompanied by something more, for example, evidence of an unexplained, abrupt change in financial circumstances, or evidence that tends to show that the defendant was living beyond his or her means. See Mitchell, 172 F.3d at 1108; Bensimon, 172 F.3d at 1129; United States v. Feldman, 788 F.2d 544, 557 (9th Cir.1986). Thus, the federal courts addressing admissibility of a petition for bankruptcy held only that a petition was not relevant in and of itself to show motive in a financial crime. See, e.g., Reed, 700 F.2d at 642-43. Matthews is not at odds with the federal cases because the court allowed the evidence to show that the defendant's lifestyle exceeded his income. See 75 Wash.App. at 286-87, 877 P.2d 252.
Here, the State presented the testimony of Michael Fitzgerald, a staff attorney for the Seattle Chapter 13 trustee. Fitzgerald explained a Chapter 13 bankruptcy, including the differences between it and a Chapter 7 bankruptcy, and testified that the Kennards first filed for Chapter 13 bankruptcy on January 30, 1997. The first creditors' meeting was on March 25, 1997. At the time of the filing, the Kennards were delinquent on their *43 mortgage by approximately $11,380, with a monthly mortgage payment of $1,120, had a boat loan of $5,000, and unsecured debt of $28,500. Their living expenses, including the mortgage, was $2,484. The Kennards stated that their combined net monthly income was $4,332. Included in this income was a projection of $700 per month overtime pay for Kennard, which never materialized. Kennard lost his job on April 2, 1997. The first robbery occurred on April 15, 1997. On April 22, 1997, the trustee received money orders from the Kennards totaling $1,064.50. The second robbery occurred on May 12, 1997. The bankruptcy trustee sent several letters to the Kennards informing them that they were delinquent on their plan payments and advising that the plan would be dismissed if the delinquency was not remedied. The letters advising that the bankruptcy would be dismissed were dated May 13, 1997, and June 3, 1997. The last payment from the Kennards, a money order for $920, was received on June 16, 1997. The case was dismissed on June 13, 1997. Because the plan was dismissed, the trustee refunded $4,785 to the Kennards on June 24, 1997. The third robbery occurred on July 3, 1997. The Kennards filed a second Chapter 13 bankruptcy petition on September 8, 1997. Mr. Kennard did not list an employer but scheduled a net monthly income for himself of $1,900.
Although we do not think that bankruptcy evidence will always be found admissible, we cannot say, under the particular facts of this case, that the trial court abused its considerable discretion by admitting such evidence here. The comparison of the Kennards' debt and expenses to their income supports an indication that they were living beyond their means. The timing of the first creditors' meeting shortly before the first robbery and the Kennards' delinquencies during the period in which the robberies took place make the bankruptcy evidence relevant.
Kennard argues alternatively that even if relevant, the prejudicial effect of the bankruptcy evidence outweighed its probative value. He asserts that the evidence concerning bankruptcy is stigmatizing. He adds that it is especially prejudicial because the State abandoned its theory that Kennard robbed the banks because he was desperate for money, arguing instead that Kennard was "desperate to feel successful, powerful, and in control." RP (January 22, 1998) at 741.
But again, we cannot say that the trial court's balancing of the probative value of the evidence against its prejudicial effect was an abuse of discretion. The bankruptcy attorney explained that in a Chapter 13 bankruptcy the petitioner seeks to establish a plan for repaying his debts. RP at 400. Thus, this evidence is not so stigmatizing as Kennard asserts. Moreover, the fact that the State did not emphasize the bankruptcy evidence in closing argument cuts against a finding of prejudice.
We affirm.
ELLINGTON, J., and APPELWICK, J., concur.