[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-12145

_____

D.C. Docket No. 1:15-cr-20459-MGC-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

WILLIAM KOSTOPOULOS,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(March 14, 2019)

Before JILL PRYOR and BRANCH, Circuit Judges, and REEVES,[*] District Judge.

PER CURIAM:

The evidence presented at trial in this case showed that William Kostopoulos abused his position as a police officer by stealing money from persons not lawfully present in this country whom he pulled over while he was on duty. When confronted by local law enforcement, he lied about his actions. A jury convicted Kostopoulos of two counts of deprivation of civil rights under color of law, in violation of 18 U.S.C. § 242, and one count of tampering with a witness, in violation of 18 U.S.C. § 1512(b)(3). On appeal, Kostopoulos challenges his convictions on two grounds. First, he argues that the district court abused its discretion by allowing the government to admit evidence of his financial condition around the time of the thefts. Second, he argues that the evidence was insufficient to convict him of witness tampering. After careful review, and with the benefit of oral argument, we affirm.

## I.    BACKGROUND

Kostopoulos, a detective with the Miami-Dade Police Department ("MDPD"), was charged with two counts of deprivation of civil rights under color

---

[*] The Honorable Danny C. Reeves, United States District Judge for the Eastern District of Kentucky, sitting by designation.

of law and one count of tampering with a witness.[1]  The following evidence was adduced at his criminal trial.

Hugo Gomez, who is from Guatemala, testified that around 9:00 p.m. one evening in September 2013, he noticed a gray Ford Taurus following him as he drove toward his house from a nearby store in Homestead, Florida.  The driver of the Taurus activated a blue light on the front windshield of the car, and Gomez pulled over to the side of the road.  The driver, a tall white man with a badge hanging around his neck, later identified as Kostopoulos,[2] approached Gomez and asked for his driver's license.  Gomez responded that he did not have one. Kostopoulos took Gomez's keys, ordered him out of the car, and patted him down. During the pat-down, Kostopoulos found a wallet in Gomez's front pants pocket; he removed the wallet and walked back to the Taurus, where he looked through the wallet.  Ten minutes later, Kostopoulos returned to Gomez, gave him back his wallet, and told him to leave while making a "handcuff" gesture.  Doc. 226 at 98.[3]

Gomez drove home.  Once home, he looked in his wallet and saw that $130 was missing.  He was hesitant to call the police because of his status, but after

---

[1] Kostopoulos also was charged with a third count of deprivation of civil rights, but the government voluntarily dismissed that count.

[2] Gomez identified both Kostopoulos and his car in a show-up identification approximately a month later.  Although there were some inconsistencies at trial regarding witnesses' identification of Kostopoulos, at this stage in the proceedings, we view the evidence in the light most favorable to the jury verdict, drawing all reasonable inferences in favor of the government. *United States v. Ramsdale*, 61 F.3d 825, 828-29 (11th Cir. 1995).

[3] Citations to "Doc. #" refer to the numbered district court docket entries.

3

discussing it with his then-wife, Luisa Bravo, he called 911 and reported the crime to the Homestead Police Department ("HPD"). HPD followed up with Gomez about the theft, but they had no leads and so took no further action.

Approximately a month later, Gomez saw the gray Ford Taurus parked at the same store near his house. He recognized Kostopoulos as the man who had stolen from him the month before. Gomez also saw his friend, Romeo Aguilar, in the parking lot. Gomez explained to Aguilar that Kostopoulos had stolen his money. He asked Aguilar to call or follow him if the Taurus followed Gomez when he left the parking lot. Gomez drove out of the parking lot, and the Taurus started to follow him. Aguilar followed behind the Taurus. Kostopoulos activated his vehicle's blue light, but Gomez did not stop this time. Instead Gomez drove toward his house, calling 911 on the way. Kostopoulos continued to follow Gomez, but eventually he pulled up next to Gomez, honked the horn, and drove away. Gomez continued home and then met with the HPD officers who had responded to the 911 call there.

Aguilar, having seen the Taurus follow Gomez at least most of the way to Gomez's home, tried to call his friend. Bravo, who was not at Gomez's home but was carrying Gomez's phone at the time, answered. Aguilar explained to Bravo what had just happened and drove to pick her up. Having decided to look for the Taurus, the two headed back to the store where Aguilar had seen Gomez minutes

4

before.  While driving, they spotted the Taurus, which had pulled over another car.  Bravo recognized the driver of the stopped car, a man from Guatemala named Santiago Garcia.  Bravo got out of Aguilar's car and began running toward Garcia and Kostopoulos, yelling warnings to Garcia.

Garcia testified that before Bravo came running toward them, he had been stopped by a gray car whose driver had activated a blue light to signal him to pull over.  When Kostopoulos approached and asked for his driver's license, Garcia answered that he did not have a license.  Kostopoulos then asked for other identification.  Garcia pulled out his wallet and $200 in cash that was in his pocket.  Kostopoulos took the wallet and the money from Garcia and asked for his registration.  Garcia was looking for the registration when Bravo approached.  Kostopoulos, who had been rifling through Garcia's wallet, tossed the wallet back in Garcia's car and left.  After Kostopoulos left, Garcia realized that his $200 was missing.

Bravo rode with Garcia to Gomez's house, where Gomez was talking with the HPD officers.  Bravo and Garcia told the officers what had happened.  HPD issued a "be on the lookout" for Kostopoulos, who was apprehended later that night by an HPD officer.

Kostopoulos was taken to HPD headquarters and advised of his *Miranda*[4] rights.  In a recorded interview, he admitted stopping Garcia earlier that night but denied taking any money from Garcia during the traffic stop or seeing anyone running toward him yelling.  In December 2013, primary responsibility for the investigation was turned over to the Federal Bureau of Investigation ("FBI").  Pamela Jackson, a sergeant in the MDPD Internal Affairs Section (a part of the MDPD's Professional Compliance Bureau) made contact with the FBI investigator who was investigating Kostopoulos's case.  She provided the FBI investigator with documents relating to Kostopoulos's activities on the days in question.

During the trial, the government introduced Kostopoulos's bank records from late July 2013 through late November 2013.  An FBI forensic accountant analyzed and summarized the records for the jury.  Kostopoulos's account, which he shared with his wife, was regularly overdrawn before his bi-weekly paycheck.  Each time the account was overdrawn, Kostopoulos paid a $34 overdraft fee.  On the day of the first theft, his account had a $1.89 balance before a $500 recurring phone payment put the account several hundred dollars in the red and triggered a $34 fee.  On the day of the second theft, his account had a negative balance, and he had incurred three $34 fees since his last paycheck.  He still had seven days until the next paycheck would be deposited.  The transactions that triggered most of the

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

6

overdraft fees were associated with Kostopoulos's wife's debit card.  Most of the purchases were for ordinary expenses like fast food, gas, and groceries, rather than luxury items.  Kostopoulos's bank never declined any transaction; it only charged the $34 fee.  During the four month period, Kostopoulos incurred $816 in insufficient funds fees and $15 in an extended overdraft fee.

The government also presented testimony from Antonio Castaneda, an FBI supervisory special agent, who monitored and oversaw civil rights cases in south Florida.  Castaneda supervised the Public Corruption and Civil Rights Squad for Miami-Dade County, also known as the Miami Area Corruption Task Force, which includes FBI agents and representatives from county and local police departments, including the MDPD.  Castaneda testified that the Public Corruption and Civil Rights Squad investigates allegations of officers taking advantage of their positions and that one type of civil rights violation the Squad pursues is theft by police officers.  The Squad works with local police departments as part of its role in enforcing criminal civil rights violations.  The FBI receives referrals from those departments and evaluates all referrals of alleged civil rights abuses to determine if the FBI will move forward with an investigation.  Once the FBI began an investigation, Castaneda explained, the FBI would coordinate with the internal affairs supervisors of local police departments to keep those supervisors informed of the progress of the case and to obtain information from those departments

relating to the officers about whom allegations were made.  Castaneda testified that the Squad's Homestead office opened and conducted an investigation into Kostopoulos's conduct.

Another government witness, MDPD officer and training advisor Christopher Hodges, testified that he knew from his professional training and experience that the FBI investigated civil rights violations committed by local police officers.

Kostopoulos testified in his own defense.  He testified that as a police officer he made over $123,000 in 2013, which included overtime and off-duty assignments.  He denied being in Homestead on the date of the first theft but admitted to being in Homestead on the date of the second theft.  He explained that on this second date he had attempted to stop a car driving recklessly but another car—ostensibly Gomez—had gotten in the way.  Kostopoulos said that he turned on his blue light and went around the car that had gotten in his way, but he lost sight of the recklessly driving car.  He also admitted to stopping Garcia, but he denied seeing anyone attempting to interrupt the stop or hearing anyone yelling.

The jury found Kostopoulos guilty on all counts.  He was sentenced to a total of 36 months' imprisonment.  Kostopoulos timely appealed his conviction.

## II.    STANDARDS OF REVIEW

8

We review the trial court's admission of evidence for an abuse of discretion. *United States v. Ramsdale*, 61 F.3d 825, 829 (11th Cir. 1995). "We review sufficiency of the evidence *de novo*, viewing the evidence in the light most favorable to the government." *Id.* at 828. We draw all reasonable inferences and in favor of the jury verdict. "We [then] ask whether a reasonable trier of fact, when choosing among reasonable constructions of the evidence, could have found the defendant guilty beyond a reasonable doubt." *Id.* at 828-89 (internal quotation marks omitted).

## III.    ANALYSIS

On appeal, Kostopoulos argues that the district court erred when it allowed the government to admit his bank records into evidence because the information in those records was irrelevant and unduly prejudicial. He also argues that the evidence was insufficient to sustain his conviction for witness tampering because the government failed to prove an element of the offense—that he intended to prevent communication of information to a federal official. We address each argument in turn.

## A.    Admission of Financial Motive Evidence

Before trial, Kostopoulos filed a motion in limine to exclude as irrelevant under Federal Rule of Evidence 401 all evidence concerning his bank account activity. *See* Fed. R. Evid. 401(a) ("Evidence is relevant if . . . it has any tendency

9

to make a fact [of consequence in determining the action] more or less probable . . . ."). The district court granted in part and denied in part the motion, limiting the admissible bank account records to those covering the four months immediately surrounding the two thefts. Kostopoulos argues that district court abused its discretion by allowing the government to admit into evidence those four months of records. We cannot agree. Under the facts of this case, the district court did not abuse its discretion because the evidence was relevant to show Kostopoulos's motive for the thefts and, considering its non-inflammatory content and limited nature, was not unduly prejudicial.

In support of his argument that the district court should have excluded the bank account records, Kostopoulos relies heavily on *United States v. Reed*, 700 F.2d 638 (11th Cir. 1983). In *Reed*, we held that testimony regarding the defendant's personal bankruptcy was irrelevant to the charge of embezzlement. *Id.* at 642. We explained that "evidence of the defendant's bankruptcy would only become relevant indirectly if it was shown that the defendant was incurring large debts *or living beyond the means possible under the living allowance* [provided by the bankruptcy trustee]." *Id.* (emphasis added). In *Reed*, however, there was no evidence that the defendant "was under any type of financial pressure." *Id.* We acknowledged that "[n]umerous courts have recognized that evidence of an imminent financial burden on the defendant is admissible for the purpose of

10

proving motive," but we noted that in those cases "the defendant was faced by potentially dire consequences . . . if he failed to meet certain financial obligations." *Id.* at 643. Although the evidence in *Reed* showed that "the defendant . . . in the past [had] found himself unable to pay off his debts," there was "no evidence . . . presented that the defendant continued[d] to suffer from [that] inability." *Id.*

The evidence of Kostopoulos's bank account activity differs materially from the evidence of Reed's bankruptcy because Kostopoulos's bank records demonstrated that he, unlike Reed, was in fact "living beyond [his] means" and "was under . . . financial pressure" during the time period surrounding the thefts. *Id.* at 642. The bank account records showed that during the time period of the two thefts Kostopoulos was unable to pay for basic living expenses like gas and groceries without incurring overdraft fees. Over the course of four months, the records showed, he incurred over $800 in such fees. Specifically, on the two days when the thefts occurred, Kostopoulos's account was overdrawn or about to be overdrawn, and on the date of the second theft, he still had another week left until his next paycheck.

Kostopoulos argues that *Reed* stands for the proposition that a defendant must be facing "potentially dire consequences" for personal financial evidence to be admissible. *Id.* at 643. He insists that he was not facing such consequences because he merely was charged $34 for each overdraft; his transactions were never

declined by the bank.  We are unconvinced that *Reed* imposes such a strict burden of proof.  Regardless, although a single $34 overdraft fee would not seem dire, the evidence did not show a single $34 fee.  Instead, the evidence showed that Kostopoulos incurred multiple fees that added up to a large sum of money over the course of a relatively short period of time.  At any point during those few months, even a small purchase might trigger an overdraft fee and put his bank account deeper in the red.  This evidence was sufficient to show that Kostopoulos was under significant financial pressure on the dates of the thefts.

To be clear, we are not suggesting that people living paycheck to paycheck are more likely to commit crimes.  Here, though, the evidence here showed "more than the mere fact that the defendant [was] poor."  *United States v. Mitchell*, 172 F.3d 1104, 1108 (9th Cir. 1999) (internal quotation marks omitted).  Instead, the multiple overdraft fees incurred in a short period of time showed that Kostopoulos was "squeezed, . . . not just [that he had a] financial interest in being richer."  *Id.* at 1109.  The evidence thus was relevant to show Kostopoulos's motive to commit the thefts.  *See* Fed. R. Evid. 401(a).

Concededly relevant evidence may be excluded, however, if its probative value is substantially outweighed by the danger of unfair prejudice.  Fed. R. Evid. 403.  In this case, the probative value of the evidence was high—without it, the jury would have been left to wonder why Kostopoulos, a police officer making

12

over $120,000 a year, might choose to steal relatively small amounts of money from vulnerable people in the community.  And the danger of undue prejudice did not substantially outweigh this probative value for two reasons.  First, the evidence of Kostopoulos's financial difficulties did not reveal that he was purchasing luxury items or needed money to sustain an extravagant lifestyle, one that might prejudice the jury against him.  Instead, the evidence showed that he was the primary breadwinner for his family and that the money was used for basic needs such as gas and groceries.  On these facts, the danger of undue prejudice was relatively low.  *Cf. Mitchell*, 172 F.3d at 1110 (concluding that evidence of the defendant's financial condition "produced a high danger of unfair prejudice" because it "portrayed him as a feckless man who did not support his wife and children" (internal quotation marks omitted)).

Second, and importantly, the district court carefully limited the financial motive evidence that it admitted.  The government initially sought to introduce 15 months of bank account records.  The district court expressed concern that the jury might assume that Kostopoulos had "some other illegitimate source of income" to cover his expenses during the time period outside of the two thefts, perhaps committing "other robberies every time he was overdrawn and the people just didn't come forward."  Doc. 216 at 20-21.  At the same time, the court acknowledged that the jury would wonder about his motive and why a person with

13

good job "would . . . be shaking down people who have no voice for 125 bucks." *Id.* at 25. The court therefore limited the evidence to the four months of records immediately surrounding the thefts—from late July 2013 through late November 2013. In sum, the district court gave thoughtful consideration to the evidence's probative value and its potential for unfair prejudice. The court did not abuse its discretion allowing the government to admit the four months of Kostopoulos's bank account records showing the accumulation of over $800 in overdraft fees.

**B.      Sufficiency of the Evidence for Federal Witness Tampering**

Kostopoulos next argues that the government failed to prove that he committed federal witness tampering, in violation of 18 U.S.C. § 1512(b)(3). To establish a violation of this statute, the government bore the burden to prove that (1) Kostopoulos engaged in misleading conduct toward another person, (2) he intended to hinder, delay, or prevent the communication of information to a federal official, and (3) the information related to the commission or possible commission of a federal crime. 18 U.S.C. § 1512(b)(3). Here, we focus on whether Kostopoulos intended to prevent communication of information *to a federal official*.[5] We refer to this requirement as the federal nexus.

---

[5] We also conclude, based on our *de novo* review of the record, that the evidence was sufficient to meet the third element, that the information related to the commission of a federal crime—here, deprivation of civil rights. *See* 18 U.S.C. § 242.

14

The federal nexus requirement easily may be proven when it is clear that the defendant intends to prevent information from reaching a particular federal officer. *See Fowler v. United States*, 563 U.S. 668, 672 (2011) (discussing a related statute, 18 U.S.C. § 1512(a)(1)(C), and noting that "[w]hen the defendant has in mind a particular individual . . . application of the statute is relatively clear").  But what must the government prove when, as here, the defendant intended to prevent information from reaching law enforcement in general rather than a particular officer?  The Supreme Court has explained the government's burden in this type of situation:  When the defendant's conduct was made with the intent to prevent communication to law enforcement officers in general rather than to some specific set of officers, "the [g]overnment must show *a reasonable likelihood*, that, had, *e.g.*, the [person] communicated with law enforcement officers, at least one relevant communication would have been made to a federal law enforcement officer." *Id.* at 677 (construing 18 U.S.C. § 1512(a)(1)(C)).  Although the government "need not show that such a communication . . . would have been [made to a] federal [officer] beyond a reasonable doubt,  [or] even that it [was] more likely than not[,] . . . the [g]overnment must show that the likelihood of communication to a federal officer was more than remote, outlandish, or simply hypothetical." *Id.* at 678.

We therefore ask whether the government proved that it was reasonably likely that the information Kostopoulos was trying to conceal would have been relayed by the HPD officer to a federal law enforcement officer. Mindful that we should not "extend[] the scope of this federal statute well beyond the primarily federal area that Congress had in mind," *id.* at 675, we conclude that the government has met its burden here through the testimony of Jackson, Castaneda, and Hodges. Together, these witnesses testified that the FBI had a special Squad— dedicated to investigating public corruption in the Miami area—which contained FBI officers and members of local police departments, including MDPD. Local police departments referred allegations of civil rights violations against their officers to the Squad. The Squad evaluated all cases referred to it and in fact investigated Kostopoulos, receiving support, including important documentation, from MDPD. Based on an MDPD officer's experience and training, it was known that the FBI would investigate alleged civil rights violations committed by police. The testimony showed cooperation between Miami-area police departments and the FBI in cases involving criminal civil rights violations, and particularly theft by police officers. Importantly, the evidence demonstrated cooperation between the MDPD and the FBI *in this very case*. That cooperation was no fluke: according to Castaneda, the Squad evaluated *all* referrals by local police departments

16

concerning alleged civil rights violations by police officers to determine whether to open an investigation.  And that cooperation was known to officers on the MDPD.

Under these facts, communication of information regarding Kostopoulos's theft to federal officers was not a mere possibility, nor was "the likelihood of communication . . . remote, outlandish, or simply hypothetical," but rather was at least reasonably likely.  *Id.* at 678.  The government thus met its burden of proving the required federal nexus.  The evidence was sufficient to convict Kostopoulos of violating 18 U.S.C. § 1512(b)(3).

## IV.    CONCLUSION

For the reasons set forth above, we affirm Kostopoulos's conviction.

**AFFIRMED.**

17