**UNITED STATES**

v.

**Staff Sergeant Donald R. JOHNSON, United States Air Force.**

**ACM 34777.**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 13 June 2001.

15 Dec. 2003.

Appellate Counsel for Appellant: Colonel Beverly B. Knott, Major Jeffrey A. Vires, Major Jefferson B. Brown, and Major Maria A. Fried.

Appellate Counsel for the United States: Colonel LeEllen Coacher, Lieutenant Colonel Lance B. Sigmon, and Major John D. Douglas.

Before PRATT, MALLOY, and GRANT, Appellate Military Judges.

## OPINION OF THE COURT

MALLOY, Judge:

The appellant was charged with possessing approximately 17 pounds of marijuana with the intent to distribute, in violation of Article 112a, UCMJ, 10 USC § 912a, and conspiring with Staff Sergeant (SSgt) Christopher Houston to possess with the intent to distribute this same marijuana, in violation of Article 81, UCMJ, 10 U.S.C. § 881. The appellant pleaded not guilty to both charges. He was convicted by a general court-martial, composed of officer and enlisted members, of the former offense and acquitted of the latter offense. The court-martial then sentenced him to a dishonorable discharge, confinement for 6 months, forfeiture of all pay and allowances, and reduction to E–1. On 8 November 2001, the convening authority waived mandatory forfeitures of pay and allowances for the benefit of the appellant's spouse but otherwise approved the sentence. This Court has jurisdiction over the case under Article 66(c), UCMJ, 10 U.S.C. § 866(c).

The appellant alleges eight assignments of error for our review. He argues: (1) It was a violation of the Fourth Amendment of the United States Constitution for a police officer to make a pretext stop, which was part of a drug interdiction operation, when the stop was part of a general scheme to use a minor traffic violation as the justification to stop his vehicle and search for drugs; (2) It was a violation of the Fourth Amendment for a police officer to stop him when that officer did not personally observe the traffic violation; (3) The military judge erred in allowing the government to introduce his financial records to argue that poverty was a motive for committing a drug offense; (4) The military judge erred in prohibiting him from discussing the results of a polygraph examination during his unsworn statement; (5) The evidence is both legally and factually

insufficient to support his conviction;[1] (6) The adjudged forfeitures should be disapproved to ensure that the convening authority's decision to provide that pay to the appellant's family is satisfied; (7) The Secretary of the Air Force must approve his court-martial proceeding because he was charged with the same offense in state court and the charge was dismissed by the state;[2] and (8) The government was collaterally estopped from re-litigating the motion to suppress that was granted by the state court.[3] We find no error that materially prejudices a substantial right of the appellant and affirm.

## I.  Factual Background

On 25 June 1999, officers from the Van Zandt County Constable's Office, the Van Zandt County Sheriff's Department and the Canton City Police Department participated in a drug interdiction operation on Interstate Highway 20 (I–20).  The City of Canton is located in Van Zandt County and is approximately 70 miles east of Dallas, Texas. As part of this operation, officers placed an illuminated Texas Department of Transportation sign on the shoulder of eastbound I–20 with the message: "CAUTION BE PREPARED TO STOP, DRUG CHECKPOINT AHEAD."  The sign was approximately 6 feet 8 inches tall, 10½ feet wide and extended 14 feet in the air.  The sign was located approximately a quarter to three-quarters of a mile before Exit 530.  Exit 530 is east of the City of Canton and leads to Farm–to–Market (FM) Road 1255.  It is in a remote area where there are no services or facilities for the traveling public and it does not lead to any other major highway.  Individuals living in the area are the primary users of the exit.  Exit 530 is approximately two miles after Exit 527 for State Highway 19. Unlike Exit 530, Exit 527 is a well-lit, full-service exit that leads to the City of Canton. In the words of one state trooper testifying in the case "it is where everyone typically stops, you know, for whatever they need because that's where all the hotels, motels, restaurants—it's well lit up and that's where everybody stops if they need services or whatever."

There was no drug checkpoint on I–20 on 25 June 1999.  Motorists who continued on their eastbound journey after passing Exit 530 did not encounter any type of checkpoint. The purpose of the drug checkpoint sign was to trick drug traffickers into taking Exit 530 in order to avoid a nonexistent drug checkpoint.  Significantly for purposes of addressing the legality of this operation, there was no checkpoint or roadblock located at Exit 530 either.  However, officers were positioned in the vicinity of the exit to observe those leaving I–20. Individuals who were observed committing a traffic violation upon leaving the highway and entering onto FM 1255 were stopped for the violation and questioned;  those who did not commit a violation were not stopped.  It is somewhat difficult for an individual unfamiliar with the exit to avoid committing a traffic violation.  The speed limit quickly drops from 65 miles per hour to 25 miles per hour and there are no lights at the exit.  FM 1255 is a two-lane road divided by a yellow centerline.  It is easy to cross the centerline when entering FM 1255 from the I–20 exit ramp, since there is only a short break in the centerline to allow entry into the lane of travel.  Crossing the yellow centerline is a traffic offense under Texas law.

It is undisputed that the officers used the traffic violations they observed at the exit as the probable cause to stop motorists using Exit 530 while the drug checkpoint sign was in use.  It is also undisputed that the real purpose of the stops was not to cite motorists for minor traffic violations, but to interdict illicit drugs on a known drug-trafficking route.  During the course of the operation, approximately a third of the motorists using the exit were stopped for such things as driving on the wrong side of the road, failure to use a turn signal and expired license plates.  Not all motorists taking the exit

1. The appellant argues that his conviction was legally insufficient, pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982).

2. The appellant raises this issue pursuant to *Grostefon*.

3. The appellant raises this issue pursuant to *Grostefon*.

were stopped, however. And no one was issued a citation during the operation.

At approximately 2200, the appellant exited I–20 at Exit 530. SSgt Houston was traveling immediately behind him in a separate vehicle. Although strenuously disputed by the appellant and SSgt Houston, the evidence indicates, and the military judge so found, that the appellant was stopped because he crossed the centerline after entering FM 1255. Although there were several officers at the scene from different local law enforcement agencies, only Deputy Constable Mickey Redwine and his superior, Constable Jim David Smith were positioned to observe the appellant's traffic violation. Constable Redwine, who was located on the side of the road, observed the appellant straddle the centerline and then signaled with a flashlight for him to pull over. SSgt Houston stopped behind the appellant's vehicle. There was no other traffic on the frontage road, other than police vehicles, and neither the appellant nor SSgt Houston was driving in an erratic or dangerous manner.

Constable Redwine told the appellant that he was stopped because he had failed to maintain his lane. The Constable retrieved the appellant's license and registration and asked him if he had any weapons or drugs. The appellant indicated that he did not and consented to the search of his car. At this point, Trooper Bruce Dalme of the Texas Department of Public Safety stepped in to assist Constable Redwine because Redwine found himself dealing with both the appellant and SSgt Houston at the same time. Trooper Dalme and his partner, Trooper Steven Baggett, had been patrolling in the area of Exit 530 and were present at the time the appellant and SSgt Houston were stopped but these officers were not actually participating in the drug interdiction operation. Both troopers have extensive training and experience in drug detection, including exposure to the smell of marijuana. Trooper Dalme first engaged the appellant in conversation and found him "unusually nervous" compared to most contacts he has with the public in the course of his duties as a police officer. After speaking with the appellant, Trooper Dalme "felt there may be something

else going on and [he] asked him if he had anything illegal in his vehicle." The appellant replied that he did not and once again gave consent to search his vehicle.

Trooper Dalme began his search at the rear of the vehicle and within about 45 seconds found a box sealed with tape that was covered by clothes in the rear of the vehicle. He immediately noticed the strong odor of marijuana coming from the box and asked Trooper Baggett to smell it, too. Trooper Baggett confirmed the unmistakable, strong odor of marijuana. At that point, Trooper Dalme directed Canton Police Officer Michael King to place the appellant under arrest. Trooper Dalme then opened the box and found three bricks of compressed marijuana wrapped in cellophane. The box also contained coffee beans and a plastic bag. According to testimony at trial, coffee beans are used to mask the smell of marijuana, which is sometimes compressed to facilitate its transportation and concealment in transit. SSgt Houston was found to be in possession of a loaded handgun, an electronic scale, plastic baggies and a small amount of unusable marijuana residue.

The appellant was charged in Van Zandt County under state law with possession of between 5 and 50 pounds of marijuana. Before entering a plea, a pretrial hearing was held on the appellant's motion to suppress the marijuana seized from his vehicle based on an illegal search and seizure. The state court's ruling, in its entirety was as follows: "It is the opinion of this Court that the Defendant's motion to suppress evidence should be and is hereby granted." The state judge later amplified his ruling in an affidavit: "I granted the Motion to Suppress the evidence based on the fact I believed after reviewing the evidence that SSgt Johnson's Fourth Amendment rights had been violated." The military judge made the following finding regarding what transpired in state court:

> In the middle of Trooper Dalme's testimony, presiding Judge Wallace asked both counsel into chambers. In the chambers he indicated that he might need to recuse himself. He told the counsel he was aware that the Canton police were conducting

illegal roadblocks and was familiar with the issue. Defense counsel told the judge that recusal wasn't necessary because the personal knowledge simply made him a better judge. Judge Wallace then filled in the gaps in the evidence for the counsel that he believed the witnesses had concealed. Since the defense counsel determined that Judge Wallace agreed with his theory, he declined to pursue the matter. After going back on the record and completing Trooper Dalme's testimony, Judge Wallace summarily granted the motion to suppress. The state subsequently moved to dismiss the charges. There were no other proceedings in the case. The court-martial charges currently before the court are based on the possession of the same marijuana.

The appellant testified both in support of his motion to suppress the marijuana as the product of an unlawful search and seizure and on the merits. Both times, he testified that he did not see the 14–foot high illuminated drug checkpoint sign and had exited at Exit 530 only because SSgt Houston was signaling for him to stop by flashing his headlights. He denied knowing that the marijuana was in his car. He contended that he had been duped into transporting the sealed box from Oklahoma City to his hometown of Monroe, Louisiana, as the result of a casual acquaintance with a fellow Mason know to him only as BJ. The appellant and BJ met in Oklahoma City after BJ noticed that the appellant was wearing a necklace which identified him as a Mason. Upon seeing the necklace, BJ informed the appellant that he, too, was a Mason. Over the course of the next year, the appellant and BJ had a number of chance and informal encounters at various places in the Oklahoma City area and would engage in casual conversation as brother Masons. Upon learning of the appellant's planned trip to Monroe, Louisiana, in June 1999, BJ asked the appellant whether he would be willing to deliver some clothes to his cousin, Junior, who coincidently lived in Monroe. The appellant testified that he agreed to transport the clothes based on his trust in and sense of obligation to assist a fellow Mason in need.

There was a complication, however. Not only did the appellant not know BJ's last name, but BJ also did not tell him Junior's last name, his address or his telephone number in Monroe, Louisiana. The plan, according to the appellant, was for BJ to contact Junior who would then contact the appellant at his (the appellant's) cousin's home to retrieve his box of clothes. After agreeing to BJ's request, the appellant and BJ thereafter met at a service station in Oklahoma City, and BJ placed the sealed box of marijuana in the back of the appellant's sport utility vehicle. The appellant testified he did not notice the smell of marijuana in his vehicle at any time prior to Trooper Dalme's discovery of the marijuana in the open luggage area of the vehicle. The appellant had no further contact with BJ over the next two years and was unable to locate him despite his best efforts. In addition, the appellant's relatives in Louisiana did not receive any calls from Junior inquiring about the whereabouts of his undelivered "clothes." The marijuana seized from the appellant's car was worth approximately $17,000.00. At the time of his arrest, the appellant was not on leave and he planned to make the trip to Monroe and back over the weekend. Although the purpose of the trip was to visit family, the appellant did not inform them that he was coming.

## II. Fourth Amendment Violation

The military judge ruled the initial stop of the appellant was based upon probable cause and the use of a ruse or deceptive drug checkpoint did not violate the Fourth Amendment protection against unreasonable searches and seizures. In reaching this conclusion, he correctly noted the critical consideration was "largely one of fact," specifically, whether the appellant committed a traffic violation upon exiting I–20 at Exit 530.

When reviewing a denial of a motion to suppress, we review questions of law de novo and findings of fact for clear error. *United States v. Robinson,* 58 M.J. 429 (C.A.A.F. 2003), *cert. denied,* —— U.S. ——, 124 S.Ct. 507, —— L.Ed.2d —— (2003). Adherence to this clear error standard when reviewing a military judge's findings of fact is particularly important in a case where, as here, the ruling is heavily dependent upon the personal

observation of the demeanor and credibility assessment of witnesses testifying on a disputed point. We, find no clear error in the military judge's findings that Constable Redwine stopped the appellant because he observed the appellant straddle the double yellow line on FM 1255, a traffic violation in Texas. Under Texas law, drivers must keep their vehicle on the right half of the roadway and maintain a single lane. Tex. Transp. Code § 545.051. Crossing a double yellow centerline and drifting into an oncoming lane, even if it is not done in an unsafe manner, constitutes probable cause for a stop. *Texas Department of Public Safety v. Chang*, 994 S.W.2d 875 (Tex.App.1999).

The Fourth Amendment protects individuals against unreasonable searches and seizures. U.S. CONST. amend. IV. This protection extends to military personnel through Mil. R. Evid. 311, which, in part, provides:

(a) *General Rule.* Evidence obtained as a result of an unlawful search or seizure made by a person acting in a governmental capacity is inadmissible against the accused if:

(1) *Objection.* The accused makes a timely motion to suppress or an objection to the evidence under this rule; and

(2) *Adequate Interest.* The accused had a reasonable expectation of privacy in the person, place or property searched; the accused had a legitimate interest in the property or evidence seized when challenging a seizure; or the accused would otherwise have grounds to object to the search or seizure under the Constitution of the United States as applied to members of the armed forces.

. . . .

(c) *Nature of search or seizure.* A search or seizure is "unlawful" if it was conducted, instigated, or participated in by:

. . . .

(2) *Other officials.* Other officials or agents of the United States, of the District of Columbia, or of a State, Commonwealth, or possession of the United States or any subdivision of such a State, Commonwealth, or possession and was in violation of the Constitution of the United States, or is unlawful under the principles of law generally applied in the trials of criminal cases in the United States district courts involving a similar search or seizure;

■ A traffic stop, including a brief stop at a roadblock or checkpoint, constitutes a seizure under the Fourth Amendment. *See United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) ("Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest"). The appellant was clearly seized for Fourth Amendment purposes at the time he was stopped by state officials at Exit 530 and he had the right to challenge that seizure at his court-martial. Mil. R. Evid. 311(a)(1).

■ In this case, the "Drug Checkpoint Ahead" sign worked as the state officers had hoped it would and as experience in similar law enforcement operations suggested it would. *See* Daniel R. Dinger and John S. Dinger, *Deceptive Drug Checkpoints and Individualized Suspicion: Can Law Enforcement Really Deceive Its Way into a Drug Trafficking Conviction?*, 39 Idaho L.Rev. 1 (2002); *State v. Mack*, 66 S.W.3d 706, 709 (Mo.2002) (deceptive drug checkpoints are effective because drivers with drugs do indeed "take the bait"). The efficacy of a law enforcement tactic, of course, says nothing about its lawfulness under the Fourth Amendment. We must, therefore, start with the question of whether the use of deception to trick drug traffickers such as the appellant into taking "the bait" runs afoul of the Supreme Court precedent on the use of drug checkpoints for general law enforcement purposes.

In *City of Indianapolis v. Edmond*, 531 U.S. 32, 34, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000), the Court addressed "the constitutionality of a highway checkpoint program whose primary purpose is the discovery of and interdiction of illegal narcotics." The Court held that the use of suspicionless stops at fixed checkpoints for the primary purpose of general crime control violates the Fourth Amendment. As the Court explained:

The primary purpose of the Indianapolis narcotics checkpoints is in the end to advance "the general interest in crime control." We decline to suspend the usual requirement of individualized suspicion where the police seek to employ a checkpoint primarily for the ordinary enterprise of investigating crimes. We cannot sanction stops justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime.

*Id.* at 44, 121 S.Ct. 447 (citation omitted).

*Edmond* involved the use of a lighted sign similar to the one used in this case. The sign read: "NARCOTICS CHECKPOINT___MILE AHEAD, NARCOTICS K-9 IN USE, BE PREPARED TO STOP." *Id.* at 35, 121 S.Ct. 447. The purpose of the operation was the same as in this case—the interdiction of illicit drugs. The similarities between *Edmond* and this case end there, however. Unlike this case, *Edmond* involved the use of a real checkpoint and the seizure—albeit temporary—of a predetermined number of motorists who were stopped when they reached the checkpoint. Once stopped, motorists were asked for their licenses and registration, their vehicles were subject to an open-view inspection, and a drug-detection dog walked around each vehicle. Thus, *Edmond* is not, as the appellant suggests, controlling of the situation in this case.

The appellant also cites *United States v. Yousif,* 308 F.3d 820 (8th Cir.2002), as further support for his position that the deception used in this case violated the Fourth Amendment. We agree with the appellant that there are factual similarities between the deception used in *Yousif* and those used in his case. Again, however, there remains the same key and dispositive distinction between these two operations that also existed in *Edmond*—there was a roadblock.

Mr. Yousif was transporting 100 kilograms of marijuana on I-44 in Missouri when he passed two signs. The first of these signs warned "DRUG ENFORCEMENT CHECKPOINT ¼ MILE AHEAD;" shortly after, the second sign warned "DRUG DOGS IN USE AHEAD." As in the present case, the signs were strategically placed before a remote, little used exit. Unlike in this case, however, the police actually established a checkpoint on the exit ramp and were under instructions to stop every vehicle that exited the highway at that exit. *Yousif,* 308 F.3d at 823.

When a vehicle would arrive at the checkpoint, at least one uniformed officer would approach the driver and ask for his or her driver's license, registration, and—if required by the state of registration—proof of insurance. Upon perceiving any indication of illegal activity, the officer would question the driver further. If there were any reason to believe the vehicle contained illegal drugs or other contraband, the officer would ask for consent to search.

*Id.* at 823-24. Upon taking the exit, Mr. Yousif was stopped at the checkpoint and in due course gave consent to the search of his vehicle during which the marijuana was discovered. *Id.* at 824. The court concluded that the checkpoint was unconstitutional. *Id.* at 827. In the court's view, even though the case differed from *Edmond,* because the signs were used to merely suggest a way to avoid a police checkpoint, the mere fact some individuals took the exit under such circumstances did not create individualized reasonable suspicion of illegal activity as to all of them.[4] The court remanded the case to allow the district court to determine whether Mr. Yousif's consent to search was nevertheless sufficient to purge the taint of the initial illegal stop.

Here, in contrast, there was no roadblock or checkpoint in use as advertised on the sign or at Exit 530, and motorists who chose to take Exit 530 were not impeded in any manner unless they were first observed committing a traffic violation under Texas law. We conclude, therefore, that this case is clearly distinguishable from *Edmond* and *Yousif,* and that *Edmond* is not controlling. This

---

**4.** But see *Mack* where the Missouri Supreme Court reached the opposite conclusion in respect to a nearly identical deceptive drug interdiction operation. In *Mack,* the court held that individualized reasonable suspicion does exist to stop a motorist who exits at a remote location after passing a deceptive drug checkpoint sign.

does not, however, end the inquiry as to whether the appellant's Fourth Amendment rights were violated.

■ As we noted earlier, there is no dispute that the police in this case used minor traffic offenses as the probable cause to stop motorists, including the appellant, at Exit 530 during the course of a drug interdiction operation. These traffic offenses were simply a pretext for their real motivation of intercepting illicit narcotics in the vehicles of those who might be attempting to evade the nonexistent drug checkpoint. Thus, the question remains, to borrow from the appellant's assignment of error, "whether it is a violation of the Fourth Amendment for a police officer to make a pretext stop as part of a drug interdiction operation when the stop was part of a general scheme to use minor traffic violations as a justification to stop motor vehicles and search for illegal drugs." The appellant's framing of this issue is only half correct. While it is true that the Texas police used a minor traffic violation as the reason to stop and question the appellant, it is not true that this initial stop was used to justify the search of his vehicle. As we have noted above, the traffic stop justified only the appellant's temporary seizure; it did not—and indeed could not—justify the search of his vehicle.

Instead, the initial search of the appellant's vehicle was based on the appellant's consent—given twice to two separate officers—and the search of the sealed box was based on Trooper Dalme's reasonable belief, based on training and experience, that it contained marijuana. There is nothing unconstitutional about asking a lawfully stopped motorist for consent to search his or her vehicle. *Ohio v. Robinette,* 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996). The appellant does not contest the voluntariness of his consent to search the vehicle.

The stop of a motor vehicle based on an observed violation of a traffic law is a stop based upon probable cause and is, therefore, reasonable under the Fourth Amendment. *Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). That the officer had a subjective intention for the stop besides the traffic violation does not change this analysis. As the Supreme Court has made crystal clear, "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Id.* at 813, 116 S.Ct. 1769 (citation omitted). Constable Redwine's action in stopping the appellant for a routine traffic violation was objectively justified, notwithstanding the fact that it was done as part of a drug interdiction operation and in the hope that it would lead to the discovery of illicit drugs. *See generally, United States v. Hornbecker,* 316 F.3d 40 (1st Cir.2003) (Illinois State Police drug interdiction team used routine traffic stop to further its drug enforcement purposes).[5] We hold the military judge did not abuse his discretion in denying the appellant's motion to suppress. Given our resolution of this issue, it is unnecessary for us to decide whether Constable Redwine had a reasonable suspicion to justify an investigative stop of the appellant independent of the traffic offense. *Robinson,* 58 M.J. at 429.

### III. The Appellant's Financial Records

■ The appellant denied any knowledge that he was transporting $17,000.00 worth of marijuana from Oklahoma to Louisiana. As part of his case, the trial counsel offered and the military judge admitted over defense objection the appellant's bank records for the period of June 1998 through June 1999 and the testimony of a bank official explaining those records, to establish the appellant's financial motive to commit the offense. The trial counsel used the records to briefly argue that the appellant was in a difficult financial position as a result of a number of factors, including a divorce, outstanding child support, loans, and overdue bills. Trafficking drugs simply provided him the opportunity to make a great deal of money. The appellant now argues that it was improper to

---

**5.** Like the present case, *Hornbecker* also involved a significant amount of marijuana seized during a consent search after a traffic stop that was suppressed in state court but admitted in a federal prosecution.

674

offer this evidence because it did nothing more than establish his "poverty."

While we agree with the appellant that evidence of poverty offered merely to show that an accused is poor is impermissible, it simply does not follow from this observation that all evidence of a person's financial circumstances is inadmissible. *See United States v. Mitchell,* 172 F.3d 1104 (9th Cir. 1999). Indeed, as the Ninth Circuit pointed out in *Mitchell,* it has issued other decisions upholding the admissibility of such evidence when it is logically relevant to a disputed issue. *See United States v. Jackson,* 882 F.2d 1444 (9th Cir.1989) (evidence that the defendant was short on funds and having financial difficulties was properly admitted because it showed more than the mere fact that the defendant was poor); *United States v. Feldman,* 788 F.2d 544 (9th Cir.1986) (evidence that the defendant owed substantial sums was relevant to show motive to commit a crime involving financial gain). Our superior court has also recognized that such evidence may prove motive and thus is admissible where evidence of financial difficulties was used to prove motive to commit larceny. *United States v. Smith,* 52 M.J. 337 (C.A.A.F.2000). The appellant's financial circumstances were probative of his motive to commit the offense. We hold that the military judge did not abuse his discretion in admitting this evidence.

### IV. Sufficiency of the Evidence

The appellant asserts that the evidence is both factually and legally insufficient to support his conviction. We disagree.

The test for legal sufficiency is whether, considering the evidence in the light most favorable to the government, a rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Turner,* 25 M.J. 324, 325 (C.M.A.1987); *United States v. Reed,* 54 M.J. 37 (C.A.A.F.2000); Article 66(c), UCMJ. Clearly, there was sufficient competent evidence in the record of trial for a rational trier of fact to have found the elements of the offense beyond a reasonable doubt.

The test for factual sufficiency is whether, after weighing all the evidence in the record of trial and recognizing that we did not see or hear the witnesses, including the appellant, as did the trial court, we are convinced of the appellant's guilt beyond a reasonable doubt. *Reed,* 54 M.J. at 41 (citing *Turner,* 25 M.J. at 325); Art. 66(c), UCMJ. Reasonable doubt, however, does not mean the evidence must be free from conflict. *United States v. Lips,* 22 M.J. 679, 684 (A.F.C.M.R.1986). "[T]he factfinders may believe one part of a witness' testimony and disbelieve another." *United States v. Harris,* 8 M.J. 52, 59 (C.M.A.1979). Applying this standard, we are convinced beyond a reasonable doubt of the appellant's guilt. We hold that the conviction is legally and factually sufficient.

### V. The Excluded Polygraph Information During Sentencing

On 4 December 2000, the appellant submitted to a private polygraph administered by an Oklahoma-licensed examiner. This examiner opined that the appellant was truthful when he denied knowing that he was transporting marijuana at the time of his arrest. During the sentencing hearing, the appellant wanted to state the following in his unsworn statement concerning this polygraph:

Never in my wildest dreams did I ever once imagine that my life would end here in your hands especially after I took and passed a polygraph. I was asked point blank if I knew there was marijuana in the box to which I responded no. The polygrapher found no deception with my answers. I was hopeful at that point that based on the fact that I did pass, I would not face charges again; however, that was not to be and now my future is in your hands.

The military judge ruled that mention of the polygraph was not permitted by either Mil. R. Evid. 707 or Rule for Courts–Martial (R.C.M.) 1001(c). The primary basis for his ruling, however, was that it was not a proper matter in extenuation under R.C.M. 1001(c). As he explained:

I find that the rule does not allow an Accused, in an unsworn statement, to impeach the verdict of the court. The ruling is that the Accused may not make a state-

ment which the logical consequence is that he is telling the members that he is not guilty of the offense.

On appeal, the appellant argues that this information was offered not to impeach the members' findings but to show "the emotional roller coaster" he was forced to endure before trial. The record reveals, however, that this is not quite the context in which the issue was presented. The military judge was rightly concerned that the only logical reason to offer the information was to impeach the members' findings. When pressed to explain how this information could be offered for any purpose other than to say, "your findings are wrong," the defense counsel was unable to do so.

Mil. R. Evid. 707 provides, in part, "the opinion of a polygraph examiner, *or any reference* to an offer to take, failure to take, or the taking of a polygraph examination, shall not be admitted into evidence." (Emphasis added.) The Supreme Court has upheld this rule of evidence. *United States v. Scheffer,* 523 U.S. 303, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998). R.C.M. 1001(c) defines matters that an accused may present in extenuation or mitigation. Matters in extenuation serve to explain the circumstances of the offense, "including those reasons for committing the offense which do not constitute a legal justification or excuse." Matters in mitigation serve "to lessen the punishment to be adjudged by the court-martial, or to furnish grounds for a recommendation of clemency." *Cf. United States v. Edwards,* 58 M.J. 49 (C.A.A.F.2003) (alleged violation of an accused's rights does not serve to explain the circumstances of the offense or mitigate the punishment and thus an accused may voluntarily waive mentioning the matter as a term of a pretrial agreement).[6]

■ The right of a convicted servicemember to address the court-martial in an unsworn statement during sentencing is an important and traditional right under military law and should be broadly construed in such

a light. *United States v. Grill,* 48 M.J. 131 (C.A.A.F.1998). Military judges must be scrupulous in protecting this right and should normally place objectionable matter in context through properly tailored instructions rather than precluding an accused from mentioning it in his or her unsworn statement. *Id.* Under the current state of the law, exclusion of objectionable material from an unsworn statement should be the exception, not the norm. This does not mean, however, that an accused's right to say whatever he wants is wholly unconstrained. *United States v. Tschip,* 58 M.J. 275, 276 (C.A.A.F. 2003). *See Edwards,* 58 M.J. at 53 (the right to make an unsworn statement is not unlimited).

■ In our view, *Grill* has not rendered military judges powerless when it comes to controlling the content of unsworn statements. Pre-*Grill* case law holds that an accused does not have the right to impeach the court's findings during the sentencing portion of his trial. *United States v. Teeter,* 16 M.J. 68 (C.M.A.1983). In addition, he does not have the right to comment on the prior sexual behavior of the victim of a sex offense. *United States v. Fox,* 24 M.J. 110 (C.M.A. 1987). These cases are, of course, not only pre-*Grill* but also address objectionable sentencing evidence and not the appropriate content of unsworn statements. Nonetheless, this distinction, in our opinion, does not change the conclusion that, in some circumstances, an accused can be precluded from offering matter, whether as evidence or in unsworn statement, that is not proper extenuation or mitigation and is barred by a rule of evidence. We find this particularly true where, as here, the only logical purpose of the information is to impeach the members' findings, the President has promulgated a per se rule of evidence excluding "any reference" to polygraphs, and that rule has withstood constitutional challenge in the Supreme Court. *See* Mil. R. Evid. 707(a). Like the military judge, we can see no logical purpose

---

6. *Edwards* involved the question of whether it is a violation of public policy for an accused to voluntarily forgo the opportunity to discuss information in his unsworn statement that is neither proper extenuation or mitigation, and thus pres-

ents a different question than the one at bar. Had Edwards not entered into a pretrial agreement, the issue before the Court would have been different.

for this information other than to say to the members "your findings are wrong." In our view, that is not proper extenuation or mitigation and should not be allowed even with a limiting instruction.

We hold that the military judge did not abuse his discretion in precluding the appellant from mentioning a polygraph examination in his unsworn statement.

### VI. Waiver of Mandatory Forfeitures

The convening authority approved the adjudged sentence of forfeitures of all pay and allowances and waived mandatory forfeitures, for a period of six months, or until release from confinement, for the benefit of the appellant's wife. Although technically incorrect because the post-trial action did not disapprove, modify, or suspend adjudged forfeitures, *United States v. Emminizer*, 56 M.J. 441 (C.A.A.F.2002), it clearly reflects the convening authority's intention to waive the mandatory forfeiture of pay and allowances under Article 58b, UCMJ, 10 U.S.C. § 858b, for the benefit of the appellant's wife. Furthermore, the record provides no basis to believe that she was not paid consistent with the convening authority's action or that finance officials have disputed her entitlement to this money, and the appellant has made no such claim before this Court. Indeed, the appellant states in his brief to this Court: "By the terms of the waiver, Appellant's spouse received Appellant's pay and allowances rather than Appellant." We hold that the action was effective to implement the convening authority's intention; therefore, there is no reason to remand the case for a new action or to disapprove forfeitures.

*United States v. Medina*, 59 M.J. 571 (A.F.Ct.Crim.App.2003).

### VII. Collateral Estoppel and Secretarial Approval

The appellant's remaining issues do not require extended discussion. The United States clearly was not bound by the Van Zandt County District Court's decision to suppress the marijuana seized from the appellant's vehicle under the principle of collateral estoppel because it was not a party to that case. *United States v. Cuellar*, 27 M.J. 50 (C.M.A.1988). The military judge, moreover, correctly determined that Secretarial permission was not necessary to proceed with federal prosecution because jeopardy had not attached under Texas law. Under Air Force Instruction 51–201, *Administration of Military Justice*, ¶ 2.5.1 (2 Nov 1999), such permission is required only when jeopardy has attached.

### VIII. Conclusion

The approved findings and sentence are correct in law and fact, and no error prejudicial to the substantial rights of the appellant occurred. Article 66(c), UCMJ; *Reed*, 54 M.J. at 41. Accordingly, the findings and sentence are

AFFIRMED.