UNITED STATES, Appellee

v.

Donald R. JOHNSON, Staff Sergeant
U.S. Air Force, Appellant

No. 04-0300

Crim. App. No. 34777

United States Court of Appeals for the Armed Forces

Argued March 2, 2005

Decided September 27, 2005

BAKER, J., delivered the opinion of the Court in which GIERKE, C.J.,
and CRAWFORD and EFFRON, JJ., joined. ERDMANN, J., filed a separate
concurring opinion.


Counsel

For Appellant: Captain John N. Page III (argued); Colonel
Beverly B. Knott, Colonel Carlos L. McDade, Major James M.
Winner, and Major Terry L. McElyea (on brief).

For Appellee: Captain Jin-Hwa L. Frazier (argued); Lieutenant
Colonel Gary F. Spencer, Lieutenant Colonel Robert V. Combs, and
Major John C. Johnson (on brief).

Military Judge: Patrick M. Rosenow


THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION

Judge BAKER delivered the opinion of the Court.

Contrary to his pleas, Appellant was convicted by members at a general court-martial for wrongful possession of marijuana with intent to distribute in violation of Article 112a, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 912a (2000). He was sentenced to a dishonorable discharge, confinement for six months, forfeiture of all pay and allowances, and reduction to pay grade E-1. The convening authority approved the sentence as adjudged but waived the mandatory forfeitures under Article 58b, UCMJ, 10 U.S.C. § 858b (2000). The United States Air Force Court of Criminal Appeals affirmed the findings and sentence. United States v. Johnson, 59 M.J. 666 (A.F. Ct. Crim App. 2000). We granted review on the following issues:

I

WHETHER IT WAS ERROR FOR THE PROSECUTION TO INTRODUCE, OVER DEFENSE OBJECTION, APPELLANT'S FINANCIAL RECORDS FROM JUNE 1998 UNTIL JUNE 1999 AND TO THEN ARGUE THAT THIS EVIDENCE OF POVERTY CREATED A MOTIVE FOR APPELLANT TO KNOWINGLY POSSESS MARIJUANA WITH THE INTENT TO DISTRIBUTE.

II

WHETHER THE MILITARY JUDGE ERRED BY DIRECTING APPELLANT NOT TO DISCUSS A POLYGRAPH EXAMINATION DURING HIS UNSWORN STATEMENT WHEN A LIMITING INSTRUCTION TO THE MEMBERS WOULD HAVE BEEN SUFFICIENT TO ADDRESS THE MILITARY JUDGE'S CONCERNS WHILE STILL PRESERVING APPELLANT'S ALLOCUTION RIGHTS.

III

WHETHER THIS HONORABLE COURT SHOULD DISAPPROVE THE
ADJUDGED FORFEITURES TO ENSURE THE CONVENING
AUTHORITY'S CLEMENCY DECISION TO PROVIDE APPELLANT'S
PAY AND ALLOWANCES TO APPELLANT'S FAMILY IS NOT
FRUSTRATED.

For the reasons that follow, we conclude that the military
judge erred in admitting Appellant's financial records but that
this error was harmless. Conversely, we conclude that the
military judge did not err in precluding Appellant from
discussing his polygraph results during his unsworn statement.[1]

BACKGROUND

On June 25, 1999, Appellant, a 30-year-old staff sergeant
(E-5) with twelve years of service, and a friend, Staff Sergeant
(SSgt) Houston, were traveling together in separate vehicles
from Tinker Air Force Base, near Oklahoma City, to Monroe,
Louisiana. They took an exit ramp while passing through Van
Zandt County, Texas, on Interstate 20 and were stopped by local
law enforcement authorities. The facts surrounding this stop
and the subsequent discovery of marijuana in Appellant's car are
found in the lower court's opinion:

At approximately 2200, the appellant exited I-20 at
Exit 530. SSgt Houston was traveling immediately
behind him in a separate vehicle. Although
strenuously disputed by the appellant and SSgt
Houston, the evidence indicates, and the military
judge so found, that the appellant was stopped because

---

[1] We have also concluded that the adjudged forfeitures in this case should be
disapproved under the authority of United States v. Emminizer, 56 M.J. 441
(C.A.A.F. 2002).

3

he crossed the centerline after entering FM 1255. Although there were several officers at the scene from different local law enforcement agencies, only Deputy Constable Mickey Redwine and his superior, Constable Jim David Smith were positioned to observe the appellant's traffic violation. Constable Redwine, who was located on the side of the road, observed the appellant straddle the centerline and then signaled with a flashlight for him to pull over. SSgt Houston stopped behind the appellant's vehicle. There was no other traffic on the frontage road, other than police vehicles, and neither the appellant nor SSgt Houston was driving in an erratic or dangerous manner.

Constable Redwine told the appellant that he was stopped because he had failed to maintain his lane. The Constable retrieved the appellant's license and registration and asked him if he had any weapons or drugs. The appellant indicated that he did not and consented to the search of his car. At this point, Trooper Bruce Dalme of the Texas Department of Public Safety stepped in to assist Constable Redwine because Redwine found himself dealing with both the appellant and SSgt Houston at the same time. Trooper Dalme and his partner, Trooper Steven Baggett, had been patrolling in the area of Exit 530 and were present at the time the appellant and SSgt Houston were stopped but these officers were not actually participating in the drug interdiction operation. Both troopers have extensive training and experience in drug detection, including exposure to the smell of marijuana. Trooper Dalme first engaged the appellant in conversation and found him "unusually nervous" compared to most contacts he has with the public in the course of his duties as a police officer. After speaking with the appellant, Trooper Dalme "felt there may be something else going on and [he] asked him if he had anything illegal in his vehicle." The appellant replied that he did not and once again gave consent to search his vehicle.

Trooper Dalme began his search at the rear of the vehicle and within about 45 seconds found a box sealed with tape that was covered by clothes in the rear of the vehicle. He immediately noticed the strong odor of marijuana coming from the box and asked Trooper Baggett to smell it, too. Trooper Baggett confirmed

4

> the unmistakable, strong odor of marijuana. At that
> point, Trooper Dalme directed Canton Police Officer
> Michael King to place the appellant under arrest.
> Trooper Dalme then opened the box and found three
> bricks of compressed marijuana wrapped in cellophane.
> The box also contained coffee beans and a plastic bag.
> According to testimony at trial, coffee beans are used
> to mask the smell of marijuana, which is sometimes
> compressed to facilitate its transportation and
> concealment in transit . . . . The marijuana seized
> from the appellant's car was worth approximately
> $17,000.00.

Johnson, 59 M.J. at 669-70.

During the Government's case, trial counsel introduced for admission a copy of Appellant's bank statements covering the period from June 1998 through June 1999. Trial counsel offered the records to show that Appellant "had a financial motive or reason for financial gain" to commit the offense. The records showed that each month during the twelve-month period, with one exception, Appellant ran a negative balance for some period during the month. Also, during one month, April 1999, the monthly statement indicated that Appellant had a check of $420 returned for insufficient funds despite the fact that he had overdraft protection on his account. The records do not reflect, and the Government did not assert at trial, that Appellant was living beyond his means, was the recipient of unexplained wealth, had engaged in sudden changes in spending patterns, or faced imminent and extraordinary financial burden.

During the defense case, Appellant claimed that he did not know that the marijuana was in his vehicle. Testifying in his own behalf, Appellant stated that he was a Mason and claimed that the box found in his car belonged to an associate of his named BJ, a fellow Mason. According to Appellant, about a year prior to his arrest, he had met BJ in Oklahoma City. Upon meeting him, Appellant discovered BJ was not only a fellow Mason, but was from his hometown of Monroe, Louisiana. Over the next year or so, Appellant had casual contact with BJ, seeing him around at various nightclubs or at the gym. According to Appellant, he ran into BJ "a lot off an [sic] on." In June 1999, Appellant planned to drive home to visit family in Monroe. He testified that on June 23, two days before departing, he ran into BJ at a gas station. BJ asked him to drop off a box of clothes to his cousin Junior who lived in Monroe as well. Appellant told BJ he was not yet sure he would be traveling to Monroe, and gave BJ his cell phone number so he could call to ensure Appellant would still be making the trip. Appellant received a call two days later from BJ asking to meet at the same gas station. He and BJ met and the two transferred the box from BJ's truck bed to the back of Appellant's vehicle. Regarding how he would know where to take the box once he arrived in Monroe, Appellant testified that BJ asked him for a number at which he could be reached in Louisiana. BJ would pass

6

this number to Junior who would in turn contact Appellant upon his arrival in Monroe.

On the stand, Appellant claimed not to recall BJ's last name and stated that he had not asked about Junior's real or full name. He also stated that he had not heard from BJ since receiving the box and being arrested despite his efforts to locate him.

## DISCUSSION

### I

### Appellant's Financial Records

Appellant contends that the military judge abused his discretion by admitting his bank records as evidence of his poor financial condition for the purpose of showing motive. In support, Appellant cites United States v. Mitchell, 172 F.3d 1104 (9th Cir. 1999), in which the court concluded in the context of a prosecution for bank robbery that poverty evidence alone had negligible probative value and produced a high danger of unfair prejudice. Id. at 1110. In contrast, the Court of Criminal Appeals concluded that Appellant's financial records were admissible because evidence of financial difficulties may prove motive to commit a crime. Johnson, 59 M.J. at 674. In reaching this conclusion, the court noted trial counsel's argument that Appellant "was in a difficult financial position as a result of a number of factors, including a divorce,

7

outstanding child support, loans, and overdue bills.

Trafficking drugs simply provided him the opportunity to make a

great deal of money."  Id. at 673.

A military judge's ruling on admissibility of evidence is

reviewed for an abuse of discretion.  United States v. Johnson,

46 M.J. 8, 10 (C.A.A.F. 1997).  To be overturned on appeal, the

military judge's ruling must be "'arbitrary, fanciful, clearly

unreasonable' or 'clearly erroneous,'"  United States v. Taylor,

53 M.J. 195, 199 (C.A.A.F. 2000)(quoting United States v.

Travers, 25 M.J. 61, 62 (C.M.A. 1987)), or "influenced by an

erroneous view of the law," United States v. Sullivan, 42 M.J.

360, 363 (C.A.A.F. 1995); United States v. Owens, 51 M.J. 204,

209 (C.A.A.F. 1999).  Thus, two questions arise:  was the

evidence of Appellant's poor financial condition relevant, and

if so, did its probative value substantially outweigh the danger

of unfair prejudice?

The mere lack of money, without more, as proof of motive,

has little tendency to prove that a person committed a crime.

Mitchell, 172 F.3d at 1108-09.  "The problem with poverty

evidence without more to show motive is not just that it is

unfair to poor people . . . but that it does not prove much,

because almost everyone, poor or not, has a motive to get more

money.  And most people, rich or poor, do not steal to get it."

Id. at 1109.  In short, wherever one falls on the financial

spectrum, there is a critical distinction between an interest in having more money and an inclination to engage in wrongdoing to meet that interest.  Thus "[a] mere interest, unconnected with inclination, desperation, or other evidence that the person was likely to commit the crime does not add much, in most cases, to the probability that the defendant committed a crime."  Id. Whatever marginal probative value impecuniosity alone may possess, there is too great a risk of raising the impermissible inference that an accused committed the offense because of his modest financial means, a description that might apply to many members of the armed forces, as well as the public at large.

However, where the moving party can demonstrate a specific relevant link to the offense in question, financial evidence may be relevant to establish motive.  Thus, courts have permitted financial status evidence in cases where the evidence in question reflects imminent and dire financial need, unexplained wealth, or that an accused is living beyond his means.  United States v. Smith, 52 M.J. 337, 341 n.2 (C.A.A.F. 2000)(evidence of financial condition may be admissible to show an abrupt change in financial circumstances); see United States v. Weller, 238 F.3d 1215, 1221 (10th Cir. 2001)(financial evidence admitted to show sudden change in financial status where defendant possessed a large amount of cash after robbery but had an empty bank account before); United States v. Fakhoury, 819 F.2d 1415,

1421 (7th Cir. 1987)(financial evidence admitted to show defendant living beyond his means); United States v. Reed, 700 F.2d 638, 642-43 (11th Cir. 1983)(mere fact of defendant's bankruptcy was not admissible to show that defendant had motive to embezzle where there was no evidence of dire financial consequences); Davis v. United States, 409 F.2d 453, 458 (D.C. Cir. 1969)(improper to question defendants about their financial condition when there was no showing that they lived beyond their means); United States v. Smith, 181 F. Supp. 2d 904, 908 (N.D. Ill. 2002)(evidence that bank account drawn down to zero did not establish financial desperation).

At a session during the trial pursuant to Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2000), defense counsel objected to the admission of the financial records asserting that the probative value of the records was substantially outweighed by the danger of unfair prejudice. The military judge asked counsel to "[a]rticulate for me the specific unfair prejudice." Counsel responded that the members would be allowed to draw the inference that "just because [Appellant] did not have a high balance in his bank account [was] indicative of some motive on his part" to traffic in drugs. The military judge overruled the objection.

The Government did not show at trial, and has not shown on appeal, that Appellant's records do more than establish a poor

financial position.  The bank records do not show a sudden change in financial circumstance, an imminent and extraordinary financial burden, or an accused living beyond his means.  What the evidence shows is that in a twelve-month period Appellant managed his finances poorly, had bills to pay, and had just barely enough cash flow to stay above water.  These conditions might describe a broad swath of military members, without converting such circumstances into motive to transport and distribute drugs.  In short, admission of these records in the absence of other relevant circumstances to show motive tended to raise the very presumption the law seeks to preclude, namely, that "those who are not well-off cannot live within a budget and that they crave money and will commit crime to obtain it." Davis, 409 F.2d at 458.  Therefore, we conclude that the military judge abused his discretion in admitting this evidence, which was negligibly relevant, if at all, and where the probative value was outweighed by the danger of unfair prejudice.

## Prejudice

We test the erroneous admission of evidence to determine whether the error materially prejudiced the substantial rights of the accused.  Article 59(a), UCMJ, 10 U.S.C. § 859(a) (2000). For a nonconstitutional error, the Government must demonstrate that the error did not have a substantial influence on the

findings.  United States v. McCollum, 58 M.J. 323, 342 (C.A.A.F. 2003).  In the case of erroneously admitted Government evidence, this Court weighs:  (1) the strength of the Government's case; (2) the strength of the defense case; (3) the materiality of the evidence in question; and, (4) the quality of the evidence in question.  United States v. Kerr, 51 M.J. 401, 405 (C.A.A.F. 1999).

The Government's case hinged on the three packages of marijuana totaling seventeen pounds discovered in Appellant's vehicle.  The police officers who stopped Appellant were able to detect the smell of marijuana emanating from the box, prompting its discovery.  In addition, the arresting officer testified that he found Appellant "unusually nervous" at the time he was pulled over for a traffic infraction.  And, as noted above, the Government sought to demonstrate motive by introducing Appellant's bank records for the previous twelve months.

In his defense, Appellant said he lacked knowledge of the contents of the box he was transporting.  He further explained how he came to possess the box by recounting his chance meeting with a man named BJ.  Appellant claimed to have bonded with BJ. He testified that their relationship lasted about a year, yet he was not sure of BJ's last name and claimed he was unable to find him after his arrest.  Similarly, the individual to whom he was to deliver the box was someone known to him only as Junior with

no last name, whom he likewise never heard from after his arrest. According to Appellant, he had given both BJ and Junior his telephone number to contact him, but did not have a way to contact either of them. To buttress his defense, Appellant also submitted twenty-seven affidavits from a variety of military members and civilians with whom he had previously served or with whom he otherwise had had contact over the years. The affidavits attested to Appellant's general good character, his good military character, and his character as a law-abiding person. The military members ranged in rank from technical sergeant (E-6) to captain. At least six of these servicemembers attested to Appellant's reputation for truthfulness. Nonetheless, a reasonable trier of fact might well have found Appellant's explanation lacking in credibility in light of his inability to contact or even recall the last name of a man he bonded with for approximately one year.

Appellant did not contest the validity of the bank records at issue, which the parties agreed represented twelve months of Appellant's banking activity. However, for all the reasons discussed above, the content of the bank records were of marginal material value to the Government's case. Indeed, the absence of wrongdoing in a prior year might tend to refute the Government's theory that someone in Appellant's financial position might have a motive to commit a crime for financial

13

gain. After all, Appellant's records reflect the same general financial condition throughout the preceding twelve months. In light of the strength of the Government's case and the limitations inherent in the defense presentation, we are skeptical that the financial records would have substantially influenced military members sitting on Appellant's court-martial, who were aware of the ordinary wear and tear of monthly budgets on modest means. Therefore, we are confident that on this record, the admission of the evidence of Appellant's bank records was harmless.

II

Appellant's Unsworn Statement

Before trial, Appellant undertook a privately administered polygraph examination arranged by the defense. The examiner concluded that Appellant was not deceptive when he denied knowing that he was transporting marijuana. During his sentencing hearing Appellant sought to refer to his "exculpatory" polygraph test during his unsworn statement using the following language:

> Never in my wildest dreams did I ever once imagine
> that my life would end here in your hands especially
> after I took and passed a polygraph. I was asked
> point blank if I knew there was marijuana in the box
> to which I responded no. The polygrapher found no
> deception with my answers. I was hopeful at that
> point that based on the fact that I did pass, I would
> not face charges again; however, that was not to be
> and now my future is in your hands.

14

The military judge ruled that polygraph test results were not permitted under either Military Rule of Evidence (M.R.E.) 707 or Rule for Courts Martial (R.C.M.) 1001(c). The military judge further explained that such information would impeach the verdict and thus precluded Appellant from including any reference to the polygraph test results in his unsworn statement.

On appeal, Appellant argues that his proposed unsworn statement was not intended to impeach the verdict, but rather was proper mitigation because it expressed his shock and dismay at the unexpected turn of events in his life. Moreover, Appellant argues that this Court's decision in United States v. Grill, 48 M.J. 131 (C.A.A.F. 1998), recognized that the right of allocution is broad and largely unfettered and thus permits an accused to include such matter in his unsworn statement.

The right of an accused to make an unsworn statement is long-standing, predating adoption of the UCMJ. Id. at 132. Among other things, the unsworn statement is an opportunity for an accused to bring information to the attention of the members or a military judge, including matters in extenuation, mitigation, and rebuttal, without ordinary evidentiary constraints. Such a right is consistent with the UCMJ's individualized approach to sentencing. The right of allocution

15

has been described as "broadly construed" and "largely unfettered." Id. at 133. It is this language that Appellant brings to the attention of the Court.

However, in Grill, while describing the right of allocution as largely unfettered, we also stated that while the right was "generally considered unrestricted," it "was not wholly unrestricted." Id. at 132 (emphasis added) (internal quotation marks and citation omitted). See also United States v. Tschip, 58 M.J. 275, 276 (C.A.A.F. 2003)(Although the scope of an unsworn statement may include matters that are otherwise inadmissible under the rules of evidence, the right to make an unsworn statement is not wholly unconstrained.) In United States v. Barrier, 61 M.J. __ (C.A.A.F. 2005), and United States v. Teeter, 16 M.J. 68 (C.M.A. 1983), we identified specific limitations on the right of allocution. We also recognized that the unsworn statement remains a product of R.C.M. 1001(c) and thus remains defined in scope by the rule's reference to matters presented in extenuation, mitigation, and rebuttal.

Polygraph evidence raises particular concerns on sentencing. First, Appellant's assertions to the contrary, "exculpatory" polygraph evidence squarely implicates this Court's admonition against impeaching or relitigating the

16

verdict on sentencing.[2]  Teeter, 16 M.J. at 73; United States v.

Tobita, 3 C.M.A. 267, 271-72, 12 C.M.R. 23, 27-28 (1953).  This

admonition is based on the principle that an accused is entitled

to vigorously contest his innocence on findings, but is not

entitled to do so on findings and sentencing.  Sentencing is

intended to afford the members the opportunity to focus on and

address matters appropriate for individualized consideration of

an accused's sentence.  Appellant's statement that "[t]he

polygrapher found no deception with my answers.  I was hopeful

at that point that based on the fact that I did pass, I would

not face charges again" could not reasonably have been offered

for any reason other than to suggest to the members that their

findings of guilty were wrong.  Secondly, we are not persuaded

that this information qualifies in any way as extenuation,

mitigation, or rebuttal under R.C.M. 1001(c).

    For these reasons, we hold that the military judge did not

err by precluding Appellant from referencing the results of the

polygraph test during his unsworn statement.

III

The Adjudged Forfeitures

    In his action, the convening authority approved the

adjudged forfeitures and waived the mandatory forfeitures for a

---

[2] While we understand the term commonly used in this area is "impeachment of the verdict," we prefer to cast the term as a prohibition on "relitigating" the findings.  This avoids any confusion with R.C.M. 923 entitled "Impeachment of Findings," which deals with an entirely different issue.

period of six months.  The Court of Criminal Appeals found that although the adjudged forfeitures were not suspended, modified, or disapproved, the action reflected the convening authority's intent to waive the mandatory forfeitures under Article 58b, UCMJ, for the benefit of Appellant's spouse.  Further, relying on declarations in Appellant's brief, the court also concluded that Appellant's spouse had received Appellant's pay and allowances for the period in question.  Johnson, 59 M.J. at 676.  Nevertheless, the Court of Criminal Appeals found it unnecessary either to remand for a new action or to disapprove the adjudged forfeitures.  Id.

"[W]hen acting on the sentence, under Article 60 [UCMJ, 10 U.S.C. § 860 (2000)], the convening authority may reduce or suspend adjudged forfeitures, thereby increasing the compensation that is subject to mandatory forfeitures, which in turn may be waived for up to six months for the servicemember's dependents under Article 58(b)."  United States v. Emminizer, 56 M.J. 441, 445 (C.A.A.F. 2002).  Because the convening authority did neither in this case, an argument could be made that, technically, the spouse received compensation to which she was not entitled.  We agree with the Court of Criminal Appeals that this clearly would have been contrary to the intended action.  Therefore, the adjudged forfeitures are disapproved.

DECISION

The decision of the United States Air Force Court of Criminal Appeals is affirmed with respect to the findings and with respect to the sentence only so far as it approves a dishonorable discharge, confinement for six months, and reduction to pay grade E-1.

United States v. Johnson, No. 04-0300/AF

ERDMANN, Judge (concurring):

I concur.  I write separately to disassociate myself from any implication that United States v. Grill, 48 M.J. 131 (C.A.A.F. 1998), properly expands the scope of pre-sentence unsworn statements.  The right to make an unsworn statement is specifically defined and limited by the Manual for Courts-Martial, United States (2002 ed.).  The scope of pre-sentence allocution through an unsworn statement includes extenuation, mitigation, and matters in rebuttal. Rule for Courts-Martial 1001(c)(2)(A).  See United States v. Barrier, 61 M.J. ___ (5-6) (C.A.A.F. 2005)(Erdmann, J., concurring in the result).  Because Johnson's proposed unsworn reference to the results of a polygraph test served to impeach or relitigate the finding of guilt rather than to extenuate, mitigate, or rebut, the military judge acted properly in preventing Johnson from referring to the polygraph examination during the unsworn statement.