**UNITED STATES**

v.

**Staff Sergeant Jason P. ARINDAIN, United States Air Force.**

**ACM 36357.**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 17 May 2004.

24 July 2007.

Appellate Counsel for Appellant: Colonel Nikki A. Hall, Lieutenant Colonel Mark R. Strickland, and Captain John S. Fredland.

Appellate Counsel for the United States: Colonel Gerald R. Bruce, Colonel Gary F. Spencer, Lieutenant Colonel Robert V. Combs, and Major Matthew S. Ward.

Before SCHOLZ, JACOBSON, and THOMPSON, Appellate Military Judges.

JACOBSON, Senior Judge:

The appellant was convicted, contrary to his pleas, of unpremeditated murder in violation of Article 118, UCMJ, 10 U.S.C. § 918. He was acquitted of rape and forcible sodomy. A military judge sitting alone as a general court-martial sentenced the appellant to a dishonorable discharge, confinement for life, forfeiture of all pay and allowances, and reduction to the grade of E–1. The conven-

ing authority approved the sentence as adjudged, but waived the mandatory forfeitures for 6 months and directed they be paid for the benefit of the appellant's dependent daughter.

On appeal, the appellant asserts: (1) his conviction should be set aside because the convening authority committed prosecutorial misconduct; (2) the convening authority's action should be remanded for a new action consistent with *United States v. Emminizer*, 56 M.J. 441 (C.A.A.F.2002); (3) the portion of his sentence that includes confinement for life is inappropriately severe; and, (4) his due process rights were violated when the convening authority did not take action until 404 days after the military judge adjudged the sentence. For the reasons set out below, we find no merit in the appellant's first, third, and fourth assignments of error. We find merit in the appellant's second assignment of error and take corrective action.

### Background

On 28 February 2003, Senior Airman (SrA) SO was found dead, face-down in a drainage ditch near Sheppard Air Force Base, Texas. An autopsy revealed she had been strangled to death. The body exhibited bruising on the head, face, and back, superficial abrasions on the face, and superficial tears to the anus. Testimony at trial indicated all the damage to the body occurred at or near the time of SrA SO's death.

The appellant stayed overnight in SrA SO's on-base housing the night before her body was discovered. According to various witnesses at trial, the appellant and the victim were involved in what might be termed a stormy relationship. The couple had a 22–month–old daughter. Although the appellant was not initially a prime suspect of investigators, he became one over the course of the next several days, largely because of statements he made to friends, co-workers of the victim, and investigators. He was ultimately charged as noted above and convicted of unpremeditated murder, largely on the basis

of circumstantial evidence elicited from a multitude of witnesses and exhibits introduced at trial by the government. While evidence was introduced to show the victim had been subjected to vaginal and anal penetration prior to her death, little if any evidence was available to show lack of consent to sexual intercourse or the use of force in regard to anal sodomy.

### Prosecutorial Misconduct by the Convening Authority

On 27 February 2004, then-Major General Regni, the convening authority, referred charges of felony murder, rape, and forcible sodomy to a general court-martial. The appellant, as noted above, was subsequently acquitted of rape and forcible sodomy and found guilty of the lesser included offense of unpremeditated murder. Approximately three months after the appellant's sentence was announced, and prior to action being taken on his case, a series of e-mail messages were exchanged between the then-recently promoted Lieutenant General (Lt Gen) Regni and the Air Education and Training Command (AETC) Staff Judge Advocate (SJA).[1] This exchange was in response to a summary of AETC's reportable sexual assault cases compiled by the AETC SJA's office and transmitted to Lt Gen Regni's office on 27 August 2004. The summary included the appellant's court-martial, and apparently Lt Gen Regni took issue with its inclusion as a reportable sexual assault case. On 28 August 2004, Lt Gen Regni e-mailed the AETC SJA, saying, in relevant part:

> Bruce: Nice summary, and useful info as we grapple with this. Only item I question is having the Aradain [sic] case in these stats ... the main charge was murder and we (at least me) on the prosecution side felt all along the sex was consensual, and secondary (really tertiary) to the case.

On 29 August 2004, the AETC SJA responded:

> Thanks, sir. I agree the main charge in Arindain was the murder. However, I be-

---

1. In August of 2004, when the e-mails were exchanged, Lt Gen Regni was no longer commanding 2d Air Force, having been reassigned to command Air University. He was therefore no longer the General Court–Martial Convening Au-

thority for 2d Air Force or Sheppard Air Force Base. The AETC SJA, Colonel Brown, was later reassigned to the position of Chief Judge of this Court. He recused himself from any action in regard to this case.

lieve the boss wanted to know all cases involving sexual assault (in this case the prosecution charged him with rape and forcible sodomy) even if the case involved a more serious charge such as murder.

Lt Gen Regni answered:

Technically correct Bruce ... my opinion tho [sic]: this was not a sexual assault case ... we all think they had consensual sex and she expired during their rather abnormal acts—then he panicked and dumped the body and made up a story.

The government disclosed this e-mail exchange to the defense on 1 September 2004, and the appellant specifically addressed the issue in his clemency request. He claimed the reason he chose the judge alone forum for his court-martial was because of the inclusion of the rape and forcible sodomy specifications. He told the (new) convening authority that had the original convening authority not committed prosecutorial misconduct by referring the rape and forcible sodomy specifications to trial, and instead referred only the original unpremeditated murder specification, the appellant would have chosen to have his case heard by a panel of officer and enlisted members. Thus, he was prejudiced by the original convening authority's referral of charges for which the convening authority "did not have reasonable grounds to believe that offenses triable by a court-martial had been committed." The new convening authority was not swayed by this argument and approved the findings and sentence as adjudged. We are likewise unswayed by the appellant's argument, for the reasons set forth below.

■ As our superior court explained in *United States v. Meek*, 44 M.J. 1 (C.A.A.F. 1996), prosecutorial misconduct "can be generally defined as an action or inaction by a prosecutor in violation of some legal norm or standard, e.g., a constitutional provision, a Manual rule, or an applicable professional ethics canon." *Id.* at 5 (citing *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)); *see generally* S. Childress and M. Davis, 2 *Federal Standards of Review* § 12.01 (2d ed.1992). Our superior court has recognized the convening authority's prosecutorial role. *See, e.g., United*

*States v. Wiesen*, 57 M.J. 48, 50 (C.A.A.F. 2002). In deciding questions of prosecutorial misconduct, we normally review the military judge's findings of fact under the clearly erroneous standard. *United States v. Argo*, 46 M.J. 454, 457 (C.A.A.F.1997). We decide de novo whether those facts constitute prosecutorial misconduct rising to the level of prejudicial error as a matter of law. *Id.* (citing *Meek*, 44 M.J. at 5–6; *United States v. Sullivan*, 42 M.J. 360, 363 (1995)). Since the allegations of prosecutorial misconduct here arose post-trial, there are no findings of fact produced by the military judge that are relevant to this issue. Instead, we have employed the fact-finding powers granted to this court under Article 66, UCMJ, 10 U.S.C. § 866, in reviewing information necessary to decide the question.

The appellant primarily focuses on two legal norms or standards the convening authority allegedly violated in referring the charges and specifications to a general court-martial. The first is Rule for Courts–Martial (R.C.M.) 601(d)(1), which states that a convening authority may refer a specification to court-martial if he "finds or is advised by a judge advocate that there are reasonable grounds to believe that an offense triable by a court-martial has been committed and the accused committed it." The second is the *TJAG Standards Policy Memorandum–3 (TJS–3), Air Force Standards for Criminal Justice*, Standards 3–3.9 (15 October 2002). This Standard, in pertinent part, dictates that "[i]t is unprofessional conduct for a prosecutor to institute, or cause to be instituted, or to permit the continued pendency of criminal charges when it is known that the charges are not supported by probable cause."

■ We find that the convening authority, at the time of referral, had reasonable grounds to believe that an offense triable by a court-martial had been committed and the accused committed it. Therefore, we find he did not violate R.C.M. 601(d)(1) by referring the charges and specifications to a general court-martial. In a 28 September 2004 affidavit, admitted into the record upon motion by the government, and without opposition from the appellant, Lt Gen Regni explained

the circumstances surrounding his August e-mail exchange with the AETC SJA. He stated that the e-mail exchange occurred while he was away from his office attending to family matters in Virginia. While checking his e-mail from a remote location, he came upon the list of AETC sexual assault cases and "became a little frustrated because the Arindain case was foremost a murder case, and not the type of sexual assault case [he] believed the AETC [Commander] was tracking." Lt Gen Regni further explained, "while it was true that there were sex offenses involved in the case, I believed the main thrust of the case was murder. So I sent a first, then a second, somewhat hasty repl[y] . . . My choice of words in the e-mails was not the best to illustrate my point." More relevant to the issue of potential prosecutorial misconduct, however, is the following assertion by Lt Gen Regni in his sworn statement:

> I was the general court-martial convening authority who referred charges against SSgt Jason P. Arindain for felony murder, rape, and forcible sodomy on 27 February 2004. At the time I referred the charges, I believed that these offenses had been committed and that the accused committed them. I based this belief on a thorough review of all the evidence and documents that were available to me at the time, including my Staff Judge Advocate's Pretrial Advice and the Article 32 Investigation.

In reviewing the documents cited by the convening authority in this affidavit, we first note that the pretrial advice from the SJA provided Lt Gen Regni with an analysis of the available evidence for felony murder, rape, and forcible sodomy and advised him that the evidence supported the specifica-

tions and referral was warranted. Likewise, the report, prepared by a military judge appointed as an Article 32, UCMJ, 10 U.S.C. § 832, Investigating Officer (IO) thoroughly analyzed the evidence and concluded that reasonable grounds existed to believe the appellant committed the offenses of rape and forcible sodomy. Additionally, the IO found that the facts of the case supported a specification of felony murder, although she recommended that the original unpremeditated murder charge be referred.

In reviewing these documents, along with other available evidence, the convening authority was acting in conformity with R.C.M. 601(d)(1) when he referred the charges to court-martial. The Drafter's Analysis, *Manual for Courts–Martial, United States (MCM)*, A21–30 (2002 ed.),[2] indicates that "[c]onsistent with the amendment of Article 34 [UCMJ], subsection (1) does not require the convening authority to evaluate the legal sufficiency of the case personally." Sufficient information existed at the time of referral for the convening authority to make his decision, and while his choice of language in his post-trial e-mails was regrettable, we do not find that these hastily drafted compositions cast doubt on the propriety of the referral, accomplished with the availability of legal advice and evidence at hand, six months earlier.[3] While the defense seems to imply that the convening authority needed to be personally convinced of the appellant's guilt prior to referral, this is not, and never has been the standard. We find no reason to doubt the convening authority's assertion in his affidavit that, based on the advice and evidence available to him at the time of referral, he had reasonable grounds to believe the offenses had been committed and the appellant committed them. We therefore hold that the

2. *Manual for Courts–Martial, United States* (2002 ed.), was the current edition in use at the time of the appellant's court-martial in 2004.

3. We further note that Lt Gen Regni's second e-mail speaks to what he and unnamed others *think* happened. By phrasing his message in the present tense, Lt Gen Regni appears to be providing his opinion on the case as it was postured in August 2004, after the appellant had been acquitted of felony murder and the sex-related charges. We do not find it at all unusual that,

several months after the case, individuals would have been speculating why the military judge acquitted the appellant of the major charges. The relevant time period for the disposition of this issue, however, was February 2004—the period immediately prior to referral. The former convening authority's beliefs about the evidence as it existed in August 2004 were irrelevant to the issue of improper referral. Thus we find the second e-mail unpersuasive as evidence of prosecutorial misconduct.

convening authority complied with both the letter and spirit of RCM 601(d)(1).

The other legal standard the appellant argues was violated by the convening authority is TJS–3, Standard 3–3.9.[4] We note from the outset that we are not convinced this standard can even be applied to a convening authority.[5] Assuming, *arguendo*, that the standard could be applied to this convening authority, we find he did not violate it by referring the specifications to court-martial. As explained above, the convening authority, at the time of referral, had reasonable grounds to believe the offenses had been committed and the accused committed them. This belief was based on his review of available evidence and documents, including the SJA's pretrial advice and the Article 32, UCMJ, investigation. There is no evidence in the record that the convening authority ever, before or during the trial, came to believe that the charges were no longer supported by probable cause. Therefore, TJS–3, Standard 3–3.9, if applicable, was not violated by the convening authority.

For the reasons set forth above, we hold that the convening authority did not commit prosecutorial misconduct when he referred the charges and specifications to trial by court-martial.

### Compliance with United States v. Emminizer

In his second assignment of error, the appellant asserts the convening authority's action is erroneous because it does not reflect the convening authority's intent. The appellant believes the convening authority intended to defer mandatory forfeitures, then waive the adjudged and mandatory forfeitures for a six-month period for the benefit of the appellant's dependent daughter. However, the convening authority did not adhere to the dictates set forth in *Emminizer* and failed to disapprove, modify, or suspend the adjudged

forfeitures. *Emminizer*, 56 M.J. at 445. As a result, the appellant argues, "it is unknown" whether the money was paid or whether any money received might need to be repaid if the government decides it was disbursed in error. Thus, the appellant argues, the action fails to accomplish the convening authority's intentions. He therefore asks this Court to set aside the action and return the case to the convening authority for new post-trial processing.

In response, the government concedes error and agrees that the convening authority should have disapproved, modified, or suspended the adjudged forfeitures before waiving the mandatory forfeitures. Thus, government counsel recommends this Court remand the record of trial to the convening authority for a new action consistent with *Emminizer*.

After examining the post-trial documents pertinent to this issue, we agree with both parties that the convening authority clearly intended to provide the appellant's dependent daughter with the appellant's full pay and allowances for the maximum amount of time allowed by law. In *United States v. Johnson*, 62 M.J. 31 (C.A.A.F.2005), our superior court corrected a similar error by simply disapproving the adjudged forfeitures. *Id.* at 38. We believe that, in the interest of judicial economy, we can and should correct the error in a similar fashion. The adjudged forfeitures are therefore disapproved.

### Sentence Appropriateness

■ The appellant asserts the confinement portion of his sentence is inappropriately severe. We have reviewed the record of trial, the appellant's argument on this issue, and the government's reply. In determining the appropriateness of a sentence, this Court exercises its "highly discretionary" powers to ensure that justice is done and the appellant receives the punishment he deserves. *See*

---

4. The portion of TJS–3, Standard 3–3.9, relied upon by the appellant states, "[i]t is unprofessional conduct for a prosecutor to institute, or cause to be instituted, or to permit the continued pendency of criminal charges when it is known that the charges are not supported by probable cause."

5. The introductory paragraphs of the document specifically state that the Air Force Standards for Criminal Justice apply to "all military and civilian lawyers, paralegals, and nonlawyer assistants in the Judge Advocate General's Corps, USAF," as well as "all lawyers paralegals and nonlawyer assistants who practice in Air Force courts and other proceedings, including civilian defense counsel (and their assistants) …" TJS–3.

*United States v. Lacy,* 50 M.J. 286, 287 (C.A.A.F.1999). Performing this function does not authorize this Court to exercise clemency. *United States v. Healy,* 26 M.J. 394, 395–96 (C.M.A.1988). The primary manner in which we discharge this responsibility is to give "individualized consideration" to an appellant "on the basis of the nature and seriousness of the offense and the character of the offender." *United States v. Snelling,* 14 M.J. 267, 268 (C.M.A.1982) (quoting *United States v. Mamaluy,* 27 C.M.R. 176, 180–81, 1959 WL 3587 (C.M.A. 1959)). In arguing that the confinement portion of his sentence is inappropriate, the appellant cites sentences adjudged in wholly unrelated cases that purportedly support his position that "saddling him with a life sentence would be inconsistent with our customary practice of military justice." This Court is unaware of the "customary practice" to which the appellant's counsel refers and we therefore choose to follow the precedents set forth by our superior court as cited above.

After a careful review of the appellant's case, we hold that the appellant's sentence is not inappropriately severe. The appellant murdered his former lover and mother of his child and unceremoniously dumped her body in a muddy ditch to be found by a passing stranger. We see no reason why the legally authorized sentence of life in prison is inappropriate under the facts of this particular case.

### Post Trial Delay

We review claims that appellants have been denied speedy post-trial processing under a de novo standard. *United States v. Moreno,* 63 M.J. 129, 135 (C.A.A.F.2006). While *Moreno* examined every step of the post-trial process, the appellant here focuses his complaint of unreasonable delay on one specific portion of the post-trial process—the length of time between the conclusion of his court-martial and the convening authority's action. He does not allege that any other period of post-trial processing was unreason-

able. We examined the entire post-trial history of the appellant's case using the standards set forth in *Moreno*[6] and *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Given the length of the record of trial, the complexity of the case, and the gravity of the offense, we find the post-action processing time was not unreasonable. However, the 404–day period between announcement of sentence and the convening authority's action bears closer scrutiny, and although the *Moreno* time standards do not specifically apply to this case, we employ them here as helpful guidance.

Our superior court in *Moreno* found a presumption of unreasonable delay where the action of the convening authority is not taken within 120 days of the completion of trial. *Moreno,* 63 M.J. at 142. In this case, the passage of 404 days between the trial's conclusion and convening authority's action certainly raises such a presumption and therefore necessitates the *Barker* four-factor analysis. These factors are: (1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice. *Barker,* 407 U.S. at 530, 92 S.Ct. 2182,[7] *United States v. Jones,* 61 M.J. 80, 83 (C.A.A.F. 2005). As the court pointed out in *Moreno,* "Once this due process analysis is triggered by a facially unreasonable delay, the four factors are balanced, with no single factor being required to find that post-trial delay constitutes a due process violation." *Id.* at 136 (quoting *Barker,* 407 U.S. at 533, 92 S.Ct. 2182).

#### 1. Length of the delay

In analyzing this element of the test, we find it helpful to further break down the 404–day delay into its component parts. First, 65 days elapsed between announcement of sentence and completion of the trial transcript. Given the length of the transcript (1,622 pages), we find this time period

---

6. This case was docketed with our Court on 12 July 2005 and is therefore not subject to *Moreno's* specific presumptions of unreasonable delay. Thus, we review using the *Barker* due process analysis.

7. As our superior court pointed out in *Moreno,* *Barker* addressed speedy trial issues in a pretrial, Sixth Amendment context, but its analysis has been widely adopted in reviewing post-trial due process claims. *See Moreno,* 63 MJ at 135.

to be very reasonable. The legal office then took an additional 28 days to assemble the record of trial and forward it to the military judge. Again, given the length of the transcript, the many sections of the transcript that comprised closed hearings and thus necessitated special handling, and the numerous sealed exhibits that also required careful attention, we find 28 days to be reasonable. Skipping ahead, we also find the 42 days between the military judge's authentication of the record and the convening authority's action to be reasonable. Thus, we are left with the approximately 260 days during which the record rested with the military judge awaiting authentication. Even given the length of the transcript, the gravity of the case, and the complexity of the issues that arose prior to, during, and after trial, we find this period of time to be facially unreasonable. Thus, the military judge's portion of the pre-action period pushed this entire section of post-trial processing into the facially unreasonable category.

### 2. Reasons for the delay

In analyzing this factor, "we look at the Government's responsibility for any delay, as well as any legitimate reasons for the delay, including those attributable to an appellant." *Moreno*, 63 M.J. at 136. We attribute the entire facially unreasonable portion of the pre-action delay to the military judge who is, of course, an employee of the government. Appellate government counsel, understandably, can offer no insight into why the military judge took 260 days to authenticate the record, except to note the length of the transcript, the number of exhibits, and the military judge's other responsibilities. We are likewise not privy to why the military judge required the length of time that she found necessary to authenticate the record, but are loathe to second-guess her judgment in this matter. Our superior court in *Moreno* applied a more flexible review of the Navy–Marine Corps Court of Criminal Appeal's judicial decision-making authority in analyz-

ing their reasons for delay than it applied to other portions of post-trial processing. *Moreno*, 63 M.J. at 137–38. We find a similar approach to be appropriate here in analyzing the length of time it took the military trial judge to authenticate the record. The military judge in this case, who also happened to be the Chief Judge of the Air Force's Central Judicial Circuit, was a highly experienced jurist who had not only presided over this lengthy case, but had served as the finder of fact. She was no doubt aware of her weighty responsibilities in this case, and the appellant's right to speedy post-trial processing. Nonetheless, she found 260 days to be the length of time necessary to complete her responsibilities and ensure justice was accomplished in this case.

We have been presented with no evidence indicating the military judge ignored her duties as they applied to this particular case, allowed the case to lie fallow for any length of time, or was deliberately dilatory in her responsibilities. We therefore find, based the military judge's discretion derived from her many years of experience as a jurist, that she took the amount of time appropriate and necessary to authenticate the record of trial. Therefore, this period of post-trial processing was not unreasonable.[8]

### 3. Assertion of the right to a timely review and appeal

The appellant, in clemency, raised the issue of delay in authentication of the record. By the time he raised the issue on 20 May 2005, the record had been authenticated by the military judge. There is no evidence that the appellant complained prior to authentication. We find this factor weighs slightly in favor of the appellant, but is not dispositive.

### 4. Prejudice

Our superior court in *Moreno* adopted a three-part analysis to assess prejudice in post-trial delay analysis, stating "prejudice should be assessed in light of the interests of those convicted of crimes to an appeal of

---

**8.** In making this finding, we do not suggest that 260 days is an appropriate length of time for authentication in every case, nor do we imply that military judges have the luxury of taking as much time they desire to authenticate a record of trial. To the contrary, we believe military judges, in the interests of justice, should be allowed the time *they need* to ensure an accurate transcript.

their convictions unencumbered by excessive delay." *Moreno,* 63 M.J. at 138. The three interests we are to examine are: (1) prevention of oppressive incarceration pending appeal; (2) minimization of anxiety and concern of those convicted awaiting the outcome of their appeals; and (3) limitation of the possibility that a convicted person's grounds for appeal, and his or her defenses in case of reversal and retrial, might be impaired. *Id.,* at 138–39 (citing *Rheuark v. Shaw,* 628 F.2d 297, 303 n. 8 (5th Cir.1980)).

### a. Oppressive Incarceration Pending Appeal

This interest is related directly to the success or failure of an appellant's substantive appeal. *Moreno,* 63 M.J. at 139. If the substantive grounds for the appeal are not meritorious, an appellant is in no worse position due to the delay, even though it may have been excessive. *Id.* at 139 (citing *Cody v. Henderson,* 936 F.2d 715, 720 (2d Cir. 1991)). Under these circumstances, as our superior court has pointed out, an appellant would have served the same period of incarceration regardless of the delay. *Moreno,* 63 M.J. at 139 (citing *United States v. Antoine,* 906 F.2d 1379, 1382 (9th Cir.1990)).

The appellant was sentenced to life in confinement. He was therefore serving confinement time during the entire 404-day period he complains was excessive. As discussed above, however, his single issue relating to his conviction is not meritorious. Therefore, he was in no worse position due to the delay, whether or not it was excessive. In fact, as we will discuss below, the delay had the potential to favorably impact his chances at clemency. We find that the appellant did not suffer prejudice as a result of his incarceration for purposes of this post-trial delay analysis.

### b. Anxiety and Concern

Although the federal circuits analyze this sub-factor in different ways, our superior court in *Moreno* found the appropriate test for the military justice system:

[I]s to require an appellant to show particularized anxiety or concern that is distinguishable from the normal anxiety experi-

enced by prisoners awaiting an appellate decision. This particularized anxiety or concern is thus related to the timeliness of the appeal, requires an appellant to demonstrate a nexus to the processing of his appellate review, and ultimately assists this court to 'fashion relief in such a way as to compensate [an appellant] for the particular harm.'

*Moreno,* 63 M.J. at 140 (quoting *Burkett v. Fulcomer,* 951 F.2d 1431, 1447 (3d Cir.1991)).

This sub-factor is not dependent upon whether an appellant's substantive appeal is ultimately successful. An appellant may suffer constitutionally cognizable anxiety regardless of the outcome of his appeal. *Moreno,* 63 M.J. at 140.

We find the appellant has not shown "particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision." *Id.* In the appellant's brief, he points to two factors which may be construed as leading to "anxiety" for the purposes of this analysis. First is the delay in his "opportunity for his prosecutorial misconduct grievances to be heard by a disinterested arbiter." We find this factor to be both factually questionable, as discussed below, and indistinguishable from the normal anxiety any other person awaiting an appellate decision (or, for that matter, a decision on clemency) would experience. The second factor cited by the appellant is the interest in his daughter's "unencumbered receipt of the waived forfeitures." We likewise find this "anxiety" unconvincing. There is no evidence in the record that the appellant's daughter did not receive the money, and although we have taken corrective action to insure the convening authority's intent is fulfilled, we find the possibility that the government might, at some future date, try to recoup money from the child to be too remote and speculative to rise to "constitutionally cognizable anxiety." Therefore, this sub-factor does not weigh in the appellant's favor.

### c. Impairment of Ability to Present a Defense at a Rehearing

This final sub-factor is directly related to whether an appellant has been successful on

a substantive issue of the appeal and whether a rehearing has been authorized. *Moreno*, 63 M.J. at 140. In order to prevail on this factor, an appellant must be able to specifically identify how he would be prejudiced at rehearing due to the delay. Mere speculation is not enough. *Id.* at 140–41 (quoting *United States v. Mohawk*, 20 F.3d 1480, 1487 (9th Cir.1994)). The appellant's substantive issue relating to his conviction was not meritorious, and no rehearing has been authorized. Furthermore, the appellant's lone statement regarding prejudice, claiming "the delay has prejudiced [the appellant] by delaying his opportunity for his prosecutorial misconduct grievances to be heard by a disinterested arbiter, as well as preventing his daughter from unencumbered receipt of the waived forfeitures" has nothing to do with how he would be prejudiced at a rehearing, if one had been authorized. He has therefore failed to establish prejudice under this sub-factor.

Viewing this sub-factor as it relates to the clemency process that is the focus of the appellant's assertion of error, we note that the 404–day pre-action delay complained of by appellant theoretically gave him a better chance in clemency than he would have had if post-trial processing had been quickly accomplished. The appellant's substantive complaint regarding his conviction was his prosecutorial misconduct claim against the original convening authority. By the time his case was ready for action, a new convening authority was in place. Thus, the appellant had the opportunity to present his clemency request to an individual with a fresh perspective on his case. He was free to attack the actions of the original convening authority without fear of offending him or worrying about pre-existing bias, and receive exactly what he desired (according to his appellate brief)—an "opportunity for his prosecutorial misconduct grievances to be heard by a disinterested arbiter."

In conclusion, after reviewing the factors set out by the Supreme Court in *Barker v. Wingo*, as clarified and explained by our superior court in *United States v. Moreno*, we find the 404–day pre-action delay complained of by appellant did not deny him his due process right to speedy review and appeal. Further, given the length and complexity of the case along with the unique issue raised by the appellant in his first assigned error, we find that the overall post-trial processing of the appellant's case has likewise not denied the appellant his due process right to speedy review and appeal.

*Conclusion*

The findings are correct in law and fact, and no error prejudicial to the substantial rights of the appellant occurred. Therefore, on the basis of the entire record, the findings are affirmed. Only so much of the sentence that includes a dishonorable discharge, confinement for life, and reduction to E–1 is approved. Article 66(c), UCMJ; *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F.2000). Accordingly, the findings and sentence, as modified are

AFFIRMED.